Maurice S. THOMPSON, et al., Plaintiffs,

v.

James GOMEZ, et al., Defendants.

No. C–79–1630–CAL.

United States District Court,
N.D. California.

Dec. 24, 1997.

Donald Specter, Steven Fama, Arnold Erickson, Prison Law Office, San Quentin, CA, for Plaintiffs.

Daniel E. Lungren, Atty. Gen., George H. Williamson, Chief Asst. Atty. Gen., Peter J. Siggins, Sr. Asst. Atty. Gen., Allen R. Crown, Supervising Deputy Atty. Gen., Diane E. DeKervor, Deputy Atty. Gen., San Francisco, CA, for Defendants.

## OPINION AND ORDER

LEGGE, District Judge.

A consent decree has been in effect since 1980 governing certain conditions of confinement for condemned prisoners in the San Quentin State Prison.[1] Defendants have filed a motion under the Prison Litigation Reform Act (the "PLRA") for termination of the prospective relief provisions of that consent decree. The practical effect of that motion would be to terminate the remainder of the decree in its entirety. Plaintiffs oppose the motion, and have filed a counter-motion to declare the termination provision of the PLRA unconstitutional.[2] This court

---

1. The consent decree was entered and has been supervised by United States District Judge Stanley A. Weigel. Upon his retirement, these pending motions were reassigned to the undersigned judge.

2. Plaintiffs also moved to declare the separate automatic stay provision of the PLRA unconstitutional. However, upon this ruling by the court regarding termination and constitutionality, the automatic stay terminates and plaintiffs' motion

has reviewed the record and the authorities pertaining to the motions, the history of the consent decree and its amendments, and the reports of the Monitor.

# I.

*This Consent Decree and the PLRA*

The plaintiff class is composed of prisoners of the State of California who are committed to the custody of the California Department of Corrections (the "CDC") under sentence of death, and are confined at San Quentin State Prison. The defendants are the Director of the CDC and the Warden of San Quentin.

Plaintiffs commenced this action in July 1979. In October 23, 1980, the parties entered into a consent decree, which was approved by Judge Weigel, requiring a number of corrective actions, including modifications in housing, treatment, and privileges of the plaintiff inmates. The required modifications were to be implemented within a one-year period.

Since the entry of the consent decree there have been investigations, hearings, court proceedings, and other activities in this case— including referral to a special master (the "Monitor") in 1985.[3] An unanticipated larger number of condemned inmates housed at San Quentin has resulted in ever-changing conditions, which has precluded full compliance with the consent decree. The compliance period was changed from one year to indefinitely.

The Prison Litigation Reform Act was passed by Congress and signed into law on April 26, 1996. Pub.L. No. 104–134, 110 Stat. 1321, §§ 801–810 (Apr. 26, 1996). The PLRA made substantial changes to civil rights litigation brought by prisoners under 42 U.S.C. § 1983 and other federal laws. Section 802 of the PLRA, which consists of amendments to 18 U.S.C. § 3626, specifically provides for the termination of consent decrees.

One purpose of the PLRA was to limit the intrusion of the federal courts into the supervision of state prisons. Broadly speaking, Congress stated its intention that federal courts should intrude into state prison conditions only where necessary to correct a *federal* right, and not to otherwise interfere in the state's operations of its prisons.

The PLRA provides that consent decrees shall not be entered by federal courts without satisfying certain conditions.

> In any civil action with respect to prison conditions, the court shall not enter or approve a consent decree unless it complies with the limitations on relief set forth in subsection (a) [of 18 U.S.C. § 3626].

18 U.S.C. § 3626(c)(1).

The PLRA further defines limits to the power of federal courts to order prospective relief:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of a Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any protective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1)(A).

The PLRA defines "prospective relief" as "all relief other than compensatory monetary damages." 18 U.S.C. § 3626(g)(7). The PLRA defines "relief" as "all relief in any form that may be granted or approved by the court, and includes consent decrees...." 18 U.S.C. § 3626(g)(9).

■ The PLRA's prospective relief provisions unambiguously confine the power of federal courts to circumstances where prospective relief is necessary to correct specific

---

regarding the automatic stay provision becomes moot.

**3.** The history of the actions in the case during its first decade is detailed in *Thompson v. Enomoto,* 915 F.2d 1383, 1384–1388 (9th Cir.1990).

violations of *federal* rights, and then to use only the least intrusive means necessary to correct such *federal* violations. For purposes of the PLRA's prospective relief provisions, "federal rights" are limited to those rights created by federal law. The legislative reports on the bill reflect these Congressional intentions:

> By requiring courts to grant or approve relief constituting the last intrusive means by curing an actual violation of a federal right, the provision stops judges from imposing remedies intended to effect an overall modernization of local prison systems or provide an overall improvement in prison conditions. The provision limits remedies to those necessary to remedy the proven violation of federal rights. The dictates of the provision are not a departure from current jurisprudence concerning injunctive relief [which provides that] ... injunctive relief must be no broader than necessary to remedy the constitutional violation.

H.R.Rep. No. 21, 104th Cong., 1st Sess., pt. 2, p. 34 (1995) (citations and quotations omitted).

█ The term "federal right" in the PLRA's termination provisions does not include any rights conferred by consent decrees that provide relief greater than that required by federal law. *Plyler v. Moore,* 100 F.3d 365, 370 (4th Cir.1996), *cert. denied* —— U.S. ——, 117 S.Ct. 2460, 138 L.Ed.2d 217 (1997).

## II.

### *The Termination Provisions of the PLRA*

The provisions of the PLRA with which we are immediately concerned here are those contained in 18 U.S.C. § 3626(b)(2) and (3). They provide as follows:

> (2) *Immediate termination of prospective relief.*—In any civil action with respect to prison conditions, a defendant or intervener shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

> (3) *Limitation.*—Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current or ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

The court will first consider the issues raised in defendants' motion to terminate the decree, and plaintiffs' opposition thereto; and will then consider plaintiffs' counter motion to declare the termination provisions unconstitutional.

## III.

### *Defendants' Motion and the Record*

Defendants' move to terminate four remedies provided in the decree. Specifically, they are those concerning (1) noise, (2) access to legal materials, (3) classification of prisoners, and (4) group religious services. The termination of these four remedies is contested by plaintiffs, but plaintiffs do not contest that the remaining prospective remedies of the decree are subject to termination. Therefore, if defendants prevail on those four remedies, the remainder of the consent decree is in essence terminated.

Defendants' motion is based upon 18 U.S.C. § 3626(b)(2), and defendants' arguments are that each of the four remedies was not and is not necessary to correct the violation of any federal right; and that no findings were made by the district court that the remedies were narrowly drawn, extended no further than necessary, and were the least intrusive means necessary to remedy the violation of a federal right.

█ It is apparent from the language of subsection (2) that this court must examine the state of the record at the time the consent decree was entered. No additional evi-

dence is necessary or appropriate in connection with that retrospective examination.[4]

However, plaintiffs also invoke subsection (3), which provides that the prospective relief should not be terminated if this court makes written findings "based on the record" that the prospective relief remains necessary to correct a current or ongoing violation of a federal right. Plaintiffs argue that under subsection (3) the court has the power to conduct addition hearings, or to remand the issue to the Monitor for further findings and recommendations.

■ This raises the question of whether "based on the record" in subsection (3) means the record that existed at the time of the consent decree, or requires an additional record encompassing present circumstances. Defendants argue that the record should be limited to that developed in the original consent decree proceedings. Plaintiffs want a new hearing on the present circumstances. This court believes that this procedural question depends upon whether the record now before the court is adequate for the court to make the determinations required by subsection (3). If the existing record is not adequate to determine present circumstances, subsection (3) gives the court the power to supplement the record by taking further evidence. The relevant record, and the arguments with respect to it, must therefore be examined under each of the four prospective remedies in dispute.

## IV.

### The Noise Remedy

This remedy was not a part of the original consent decree. In 1988 the Monitor recommended a finding that the noise levels in East Block were excessive, in violation of the Eighth Amendment. (Third Report at 38–39, adopted by the court on December 15, 1988). The Monitor based his determination in part on *Toussaint v. McCarthy*, 597 F.Supp. 1388 (N.D.Cal.1984), *aff'd as to remedy*, 801 F.2d 1080 (9th Cir.1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987), a case brought by admin-

istrative segregation inmates housed in the same cell blocks in San Quentin. In *Toussaint*, Judge Weigel ordered the prison to take various measures to reduce the noise levels experienced by those plaintiffs. Mr. Robert Riggs has served as Monitor in both cases. In this case, the Monitor requested that the parties show cause why this consent decree should not be modified to adopt the relief ordered in *Toussaint*: (1) to prohibit inmates from using loudspeakers; (2) to install sound-absorbing wall coverings; and (3) to provide sound-exclusion devices, such as ear plugs, to the inmates. (Decree Provision XIII, Third Report at 40). However, the Monitor noted that the decree in this case "will not necessarily require any change in the present operation of the East Block," because defendants had undertaken steps to comply with the *Toussaint* order to the same effect. (Third Report at 40 n. 14).

In his Fourth Report, adopted by Judge Weigel on October 5, 1989, the Monitor recommended that the *Toussaint* noise remedies be added to this consent decree. The Monitor referred to the provisions of the *Toussaint* injunction, and recommended that the same protections should be afforded condemned prisoners in the same units. (Fourth Report at 56–57). "The fact that the anti-noise provisions of the *Toussaint* Judgment of Permanent Injunction have been effective favors the equity of including a similar provision in the Consent Decree herein." *Id.* In 1991 the Monitor found in *Toussaint* that "conditions of noise in East Block currently satisfy minimum constitutional standards." (*Toussaint* Sixth Report at 8).

In his Memorandum Regarding the PLRA in August 1996, the Monitor recommended that the noise remedy not be terminated because the court granted that relief "on the basis of an express or implied finding that the relief was 'narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.'" (Memorandum re PLRA at 2; notes omitted). The Monitor in part cited *Toussaint*, which had used the

---

4. This court also notes that Judge Weigel's decisions must now be examined under the require-

ments of the PLRA, which were not in existence at the time of his decisions.

following standard to order the relief in that proceeding: "[T]he remedial order must address only the specific conditions that violate the Constitution, and only to the extent required to correct the specific violations. A remedy may go beyond this, however, when there is a record of past constitutional violations and violations of past court orders." *Toussaint* 597 F.Supp. at 1419 and n. 51.

■ Defendants first argue that the *Monitor's statement* about Judge Weigel having made the required findings is insufficient in this proceeding, and cannot substitute for the *findings themselves;* therefore, this court should now look at the record itself to see whether Judge Weigel did indeed make the required findings. This court agrees. In reviewing the Monitor's recommendations and Judge Weigel's order, this court must engage in a *de novo* review of Judge Weigel's actual findings.

■ Second, defendants argue that at the time the Monitor recommended adoption of the noise remedy in his Fourth Report, he acknowledged that the noise conditions had already been resolved as the result of the *Toussaint* injunction. Thus at the time the noise remedy was adopted in this consent decree it was arguably not "necessary" to address an ongoing federal violation. That position is correct, but it does not resolve the entire issue.

■ Third, defendants argue that the Monitor's Third and Fourth Reports and the *Toussaint* decision do not support the proposition for which he cited them in his 1997 Memorandum Re PLRA; that is, whether Judge Weigel made the requisite findings in this case. That is correct as to the two reports. Judge Weigel adopted those reports, and the reports did state that the noise levels constituted an Eighth Amendment violation. But the reports did not address whether the relief was narrowly drawn, or the other required findings under the PLRA. The standard used in *Toussaint* allowed for remedies beyond the constitutional minimum prescribed by the PLRA, and Judge Weigel did not make clear whether he based his remedial order on that broader standard or considered it mandated by the constitutional

minimum. Therefore the *Toussaint* decision is not equivalent to the required findings under the PLRA.

Further, defendants argue that even if *Toussaint* made the findings that the Monitor attributed to it, the *Toussaint* findings cannot be used here. In citing *Toussaint* in his Memorandum re the PLRA, the Monitor characterized *Toussaint* as "determining specific relief for noise incorporated in the Court's orders herein . . . ." That appears to state that Judge Weigel formally incorporated the *Toussaint* findings as part of this record. However, there is no indication of where in the record of this case there is a statement of that incorporation.

Finally, defendants argue that the *Toussaint* findings were based on the different factual circumstances of those plaintiffs, and are inapplicable to the plaintiffs in this case. However, this seems unlikely given that the general noise level would affect the segregated and the condemned prisoners equally.

This court concludes that because the Third and Fourth Reports contained minimal findings and the *Toussaint* order used a standard broader than that now required by the PLRA, Judge Weigel previously did not make the findings now required by the PLRA.

■ Plaintiffs urge the court, under subsection (3), to make present findings that the noise remedy remains necessary to correct a current violation of a federal right, extends no further than necessary, and is narrowly drawn and the least intrusive means. However, the record shows that defendants have implemented plans to provide earplugs on a monthly, rather than an on-request basis, and that there is no ongoing federal violation. The parties seem to agree that at present plaintiffs are not suffering noise levels that constitute a violation of the Eighth Amendment. Defendants have come into compliance with this term of the decree.

Plaintiffs argue that even if this is true, defendants implemented their procedures only in response to the Monitor's Sixth Report—that is, because they were compelled to do so—and thus that the decree remains necessary to prevent a violation from occur-

ring. However, there is no showing of a current or ongoing violation now that adequate policies are in place. There is at most a *possible* future violation, which is insufficient to prevent termination under the PLRA. Plaintiffs' argument amounts to a contention that defendants' "true" underlying policies have not changed, and that once the overlaid decree is lifted, defendants will revert. However, this does not constitute an ongoing violation. Plaintiffs' argument would nullify any termination provision. Plaintiffs' logic would require all decrees to remain in place to guard against backsliding. But the decree is to end when defendants come into compliance with its provisions.

In effect the termination requirement of the PLRA modifies any termination provision in the decree itself, and applies on a provision-by-provision basis, rather than to the decree as a whole.

Defendants' motion to terminate the noise provision of the decree is therefore granted.

## V.

### *Legal Materials*

The original consent decree included a remedy regarding legal materials, which provided that certain legal materials must be kept current and made available to the inmates on a check-out basis. This "pocket library" supplemented the prison's main law library, which inmates accessed by "paging"—that is, by submitting a written request for books to be delivered from the main law library. After the original decree in this case was entered, the *Toussaint* court found that the paging system unconstitutionally limited segregated inmates' access to the courts, and ordered San Quentin officials to allow segregated prisoners physical access to a prison law library. *Toussaint* 597 F.Supp. at 1413.

In his Third Report, the Monitor then addressed whether, in light of *Toussaint,* the paging system plus the pocket library in this case passed constitutional muster, and concluded that it did not. (Third report at 42–43). The Monitor recommended that the parties show cause why the decree should not be amended to include a provision that,

"Defendants shall, upon the written request of any condemned inmate, provide that inmate with reasonable physical access to an adequate law library." (Third Report at 43). The Fourth Report repeated the Third Report's conclusion and recommendation. Judge Weigel adopted both reports.

By the time the Monitor issued his Sixth Report in November 1995, prison officials were providing plaintiffs with physical access to a special law library separate from the main law library at the prison. The Monitor found that the law library access was "far from ideal," and that "the system could possibly be improved" to afford inmates longer and prompter access. The Monitor recommended that defendants propose a plan to address aspects of physical access to the library, including the time allowed for research and photocopying, the contents of the collection, the training of library staff, and other issues.

Defendants assert that they currently provide the plaintiff inmates with access to a special law library, and that they have complied with the other aspects of access recommended by the Monitor.

■ At the time of the original court decree in this case, Judge Weigel did not make findings that the legal materials remedy was narrowly drawn, extended no further than necessary, and was the least intrusive means, as now required by the PLRA. Just as with the noise remedy, the Monitor in his Memorandum re the PLRA stated that the court had made such findings, citing his Third Report, Fourth Report and the *Toussaint* opinion. However, just as with the noise remedy, that record does not contain the requisite findings by Judge Weigel. In his Fourth Report, the Monitor recommended that the court take judicial notice of the Second Special Report of the Monitor in *Toussaint.* Judge Weigel subsequently adopted that Fourth Report. Even if that implies that this record effectively includes the *Toussaint* findings, those findings do not include the present requirements that the remedy was narrowly drawn, extended no further than necessary, and was the least intrusive means.

Defendants also argue that there was never a sufficient finding of a federal violation under the later standard of *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996): "Because *Bounds v. Smith,* [430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) ] did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is sub-par in some theoretical sense." *Id.* at 351, 116 S.Ct. at 2180. Plaintiffs must show actual injury to establish a constitutional violation. *Id.* at 349, 116 S.Ct. at 2179. "Actual injury" does not necessarily mean absolute prejudice; significant delays that hinder or impede a claim are enough. *See e.g. Allen v. Sakai,* 48 F.3d 1082, 1091 (9th Cir.1994). Plaintiffs respond that the PLRA should not be interpreted to require constitutional findings based on standards that were not in effect at the time. These arguments are largely beside the point. It is clear that even if the court made a sufficient finding of a federal violation under the old standard defined by case law, whatever it might be, the other findings now required by the PLRA were not made.

■■■ Defendants further argue that there is no current or ongoing violation of plaintiffs' right of access to the courts, because plaintiffs have made no showing of "actual injury" under *Lewis.* Plaintiffs respond by citing the Sixth Report in 1995, which found that law library access was inadequate for some prisoners. It noted that prisoners had been restricted to approximately two hours per week of library time, and were sometimes denied access to the library because there was insufficient space. Plaintiffs argue that these findings indicate that plaintiffs have been sufficiently "frustrated" or "hindered" to show actual injury under *Lewis.* However, defendants cite to later Reports and Plans in Response to the Sixth Report, which detail defendants' remedies for the deficiencies stated in the earlier reports.

The court believes that this is a sufficient present record for this court to determine that there is not an adequate showing of any present "actual injury." Defendants' motion to terminate this remedy is therefore granted.

## VI.

### *Classification*

Condemned prisoners can pose special security concerns, because they may no longer be deterred from violent behavior by the threat of ordinary sanctions, may be targets for acts of violence by other prisoners, and may pose a greater risk of suicide. Before the decree in this case, all condemned prisoners were housed in the most restrictive forms of segregation at San Quentin. Plaintiffs' complaint in this case alleged that such automatic segregation deprived them of a due process liberty interest.

Under this decree, plaintiffs are now classified as Grade A, Grade B, or walk-alone. Grade A prisoners are those who are able to get along with other inmates and staff; they are provided a form of custody which includes contact visits, out-of-cell time, and some privileges similar to those provided to the general population prisoners. Grade B prisoners are those who are classified as trouble-makers or escape risks, and they are provided only those rights and privileges that are provided to prisoners in maximum security segregation. Walk-alones are prisoners who would be Grade A prisoners, but must remain separated from other inmates for their own protection. Those prisoners are provided as much of the Grade A privileges as are possible.

Defendants argue that Judge Weigel did not make the findings required by subsection (2). In his Fourth Report, the Monitor stated that the decree's classification system resolved the federal constitutional claims alleged in plaintiffs' complaint. The report also said that plaintiffs had a due process liberty interest derived from *state* regulations, which mandate that prisoners be released from segregation at the earliest possible time. *C.f. Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (state administrative regulations can give rise to a liberty interest protected by the Fourteenth Amendment); 15 Cal.Code Regs. § 3339(a) ("Release from segregation status shall occur

at the earliest possible time in keeping with the circumstances and reasons for the inmate's initial placement in administrative segregation"); *Toussaint v. McCarthy,* 801 F.2d at 1098 (§ 3339(a) in combination with §§ 3335–36 accords California inmates a liberty interest in freedom from segregation). Judge Weigel adopted this report and found that plaintiffs continued to have a colorable claim under the Fourteenth Amendment.

However, the law on when a *state* regulation may create a due process liberty interest has changed since the Monitor issued his Fourth Report. The methodology used in Hewitt impermissibly shifted the focus of the liberty interest inquiry from one based on nature of the deprivation to one based on language of a particular regulation. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (holding that discipline in segregated confinement did not present the type of deprivation in which a state regulation would create a liberty interest).

> [State created liberty] interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Protection Clause of its own force, ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Id.* at 484.

■ The Monitor and Judge Weigel never made findings determining whether the classification system posed an "atypical and significant hardship" on the condemned inmates sufficient to warrant *federal* due process protection. Further, the court did not make findings that the classification remedy was narrowly drawn, extended no further than necessary, and was the least intrusive means. Thus the requirements for termination under subsection (2) are satisfied, unless this court could make current findings that satisfy subsection (3).

■ Defendants argue that there is no current or ongoing violation because the current classification scheme does not present the atypical, significant deprivation necessary for a federal liberty interest. The parties again, as with the noise remedy, differ about the true issue before this court. Defendants argue that with the current classification system in place, there is no ongoing violation. Plaintiffs seem to concede as much: "In the Fourth Report, the Monitor found that the decree's classification system resolves the federal constitutional claims set forth in plaintiffs' complaint." (Opposition at 41). Plaintiffs argue, however, that if the classification remedy were terminated, defendants would be free to return to segregating condemned prisoners as they did before the decree. "The present classification system does not create a significant deprivation, but such a deprivation would occur if condemned prisoners were automatically segregated in the absence of the Decree under defendants' former policies and practices." (Opposition at 43). As with the noise remedy, this is not a showing, or even an allegation, of a *present ongoing* violation. Under the PLRA, this court cannot keep this provision of the decree in place on the grounds that defendants might *later* decide to violate plaintiffs' due process rights.

The court therefore grants defendants' motion to terminate the classification remedy of the decree.

## VII.

### *Group Religious Services*

The original consent decree provided for group religious services. "Group religious services and counseling will be permitted for Grade A inmates on a reasonable schedule, on the tier during the hours 9:00 a.m. to 3:00 p.m." (Decree Provision VI.H). Plaintiffs currently have access to religious materials and to counseling. The remaining issue is the group religious services.

The Fourth Report indicates that conflicting testimony was presented to the Monitor as to whether prison officials were making group religious services available to plaintiffs in the East Block exercise yards. The Monitor recommended modification of the decree to permit such services to take place in the yards, and Judge Weigel adopted the report.

In his Sixth Report the Monitor reported that the "current unavailability of Mass, and

other group religious services, poses a substantial burden on the religious beliefs and practices of some Grade A inmates housed in East Block." (Sixth Report at 36). The report stated:

> The gist of the problem is that although group religious services are now formally "permitted" in East Block, in practice they have never occurred. The current institutional chaplains, both Catholic and Protestant, do not consider the exercise yards of East Block to be an appropriate environment for offering group religious services. Secondarily, San Quentin officials state that group religious services have never been "requested" by any specific group of inmates.

Sixth Report at 35–36.

The Sixth Report therefore recommended that defendants provide a plan for group services for plaintiffs in East Block. Defendants provided such a plan on January 23, 1996. It outlined a plan to convert a shower area to an area suitable for services, approved in writing by the chaplains. But the plan stated that, "This proposal is not implemented at this time and will require approval prior to implementation, as contemplated by the Sixth Report." (Plan at 3). There is no evidence as to whether the plan has been implemented.

■ Defendants argue that the Monitor's findings in the Sixth Report are insufficient under subsection (2). Plaintiffs seem to concede this point. The Sixth Report also cited to the Religious Freedom Restoration Act of 1993, 107 Stat. 1488, 42 U.S.C. § 2000bb et seq. And since then, the U.S. Supreme Court has struck down RFRA. *City of Boerne v. P.F. Flores, Archbishop of San Antonio*, ——U.S.——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). In any case, it is clear that whether or not the Monitor made findings that would show a federal constitutional violation under the pre-RFRA standards, he did not make the other findings required by subsection (2). Nor did Judge Weigel.

■ Defendants further argue that there is no current or ongoing violation. The pre-RFRA standard, and thus the current standard, requires this court to consider (1) whether there is a valid rational connection between the prison rule and a legitimate governmental interest; (2) whether prisoners have alternative means of exercising their right; (3) whether accommodation of the right will have a significant effect on prisoners or staff; and (4) whether the restrictions are an exaggerated response to legitimate prison concerns. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987); *Turner v. Safely*, 482 U.S. 78, 89–91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Defendants do not analyze these factors separately, but simply argue that "[w]hen balanced against the prison's legitimate interest in maintaining the safety, security, and order of the prison, the First Amendment does not mandate that group religious services be provided to prison inmates." (Motion at 23). Defendants also cite cases concluding that certain prison restrictions did not violate the First Amendment; but those were fact-specific inquiries, and thus of limited precedential value here. As to certain of the *Turner* factors, plaintiffs merely argue from language of the Sixth Report.

■ The record is undisputed that plaintiffs presently have access to religious materials and to counseling. In addition, defendants have agreed to implement the plan to create an area suitable for religious services, which has been approved by the chaplains. In view of this record, the court must conclude that plaintiffs' legitimate interests in practicing their religion are being addressed. And balanced against the prison's legitimate concerns over safety, security, order, and the physical arrangement of the prison facilities, the first amendment does not require defendants to make any changes other than the plan which they have agreed to implement. The present unavailability of group religious services does not violate a substantial federal right. *McCabe v. Arave*, 827 F.2d 634, 637 (9th Cir.1987). There is certainly no present impairment of plaintiffs' individual rights to practice their religion.

The court therefore grants defendants' motion to terminate the group religious services remedy of the consent decree.

This court has therefore concluded that under 18 U.S.C. § 3626(b)(2) and (3) the prospective relief of the consent decree should be terminated. However, plaintiffs assert arguments as to why the PLRA should not be applied. The court will now address those arguments.

## VIII.

### *Retroactivity*

Plaintiffs argue, under principles of retroactivity, that the PLRA should not apply to those forms of prospective relief already embodied in the consent decree itself. Defendants argue that the PLRA's termination provision is fully retroactive.

 Congress explicitly provided that the termination provisions of the PLRA would apply to consent decrees which were entered prior to the passage of the PLRA. In a separate section at the conclusion of the statute entitled "Application of Amendment," Congress provided as follows:

> Section 3626 of title 18, United States Code, as amended by this section, shall apply with respect to all prospective relief whether such relief was originally granted or approved before, on, or after the date of the enactment of this title.

Pub.L. 104–134, Title I, § 101[ (a) ] [Title VIII, § 802(b)(1) ], Apr. 26, 1996, 110 Stat. 1321–70; renumbered Title I Pub.L. 104–140, § 1(a), May 2, 1996, 110 Stat. 1327.

 In determining whether a statute will be applied retroactively, a "court's first task is to determine whether Congress has expressly prescribed the statute's proper reach." *Landgraf v. USI Film Products,* 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). In the PLRA Congress defined "prospective relief" as "all relief other than compensatory monetary damages," 18 U.S.C. § 3626(g)(7), and defined "relief" to be "all relief in any form that may be granted or approved by the court, and includes consent decrees...." 18 U.S.C. § 3626(g)(9). And in the separate section "Application of Amendment," Congress expressly said that Section 3626 as amended "shall apply with respect to all prospective relief whether such relief was originally

granted or approved before, on, or after the date of the enactment of this title." That is a clear statement of Congressional intent. Where Congressional intent as to the application of a statute to pending cases is clear from the legislation, it must govern. *Landgraf,* 511 U.S. at 280.

## IX.

### *Constitutionality of the Termination Provision*

Plaintiffs have made a counter motion to declare the termination provision of the PLRA unconstitutional. Plaintiffs argue that the termination provision (1) violates the constitutional separation of powers, (2) violates plaintiffs' due process rights, and (3) denies plaintiffs equal protection. Plaintiffs also argue that this court should interpret the PLRA in order to avoid these constitutional problems, including problems of retroactivity.

### A. *Separation of Powers*

Plaintiffs argue that the termination provision violates the principle of separation of powers for three reasons, each of which would be a basis for invalidating the provision on constitutional grounds: (1) the provision allegedly vacates a final judgment of this court, by adding procedural requirements that were not mandated when the decree was first entered; *see Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995); (2) the provision allegedly dictates the outcome of cases; *see United States v. Klein,* 13 Wall. 128, 80 U.S. 128, 20 L.Ed. 519 (1871); (3) the PLRA as a whole, and in particular its termination provision, allegedly deprives the federal courts of the ability to decide and enforce effective remedies for constitutional claims; and (4) Congress enacted the PLRA in order to undo judicial decisions.

### 1. *The Termination Provision Does Not Improperly Vacate A Final Judgment.*

 Several courts have already examined the PLRA's termination provision in light of separation of powers principles. *All of the circuit courts which have addressed the issue have found the provision to be*

constitutional. *Gavin v. Branstad,* 122 F.3d 1081(8th Cir.1997); *Plyler v. Moore,* 100 F.3d 365 (4th Cir.1996), *cert. denied* —— U.S. ——, 117 S.Ct. 2460, 138 L.Ed.2d 217 (1997); *Benjamin v. Jacobson,* 124 F.3d 162 (2d Cir. 1997); and *Inmates of Suffolk County Jail v. Rouse,* 129 F.3d 649 (1st Cir.1997). Several district court decisions have also examined the issues, with mixed results. This court will not cite or discuss those district court decisions, because this court is persuaded by the number and the reasoning of the circuit court decisions.

In absence of a decision by the Ninth Circuit, this court concludes based upon those decisions by other circuit courts that the termination provision of the PLRA does not violate separation of powers principles by vacating a final judgment of the court.

### 2. *The Termination Provision Does Not Prescribe Rules of Decision.*

The U.S. Supreme Court held in *United States v. Klein,* 13 Wall. 128, 80 U.S. 128, 146, 20 L.Ed. 519 (1871) that Congress may not "prescribe rules of decision" to the courts in cases pending before them without violating the separation of powers. In *Klein,* Confederates who had been granted Presidential pardons were suing for the proceeds of property that had been confiscated by the government during the Civil War. Pursuant to his constitutional power, the President had pardoned ex-Confederates and restored their property rights. The Court of Claims decided that the pardon entitled claimants to payment for confiscated property. The Supreme Court affirmed. Congress then passed a law making such pardons inadmissible in evidence to establish a claimant's entitlement to the confiscated property, but making them conclusive evidence that the bearer had aided in the rebellion. For cases in which the Court of Claims had already ruled in the claimants' favor, the statute deprived the Supreme Court of appellate jurisdiction and directed dismissal of the cases.

The Supreme Court held that Congress' attempt to prescribe rules of decision violated the separation of powers because it prohibited the courts from giving "the effect to evidence which, in its own judgment, such

evidence should have," and directed the courts to "give it an effect precisely contrary." 80 U.S. at 147.

Plaintiffs here argue that the PLRA violates the same principles. "In *Klein,* the court was required to dismiss the case upon a determination of the existence of certain facts—a pardon. Under the PLRA, the court is required to terminate relief upon a determination of the existence of certain facts—the absence of particular findings." (Opposition at 17). There is an important difference, however. Under the PLRA courts must apply changes in the law and make true judicial determinations. "... Congress does not mandate a rule of decision when it amends the law underlying a pending case." *Plyler,* 100 F.3d at 372; *Plaut,* 514 U.S. at 218 (citing *Robertson v. Seattle Audubon Society,* 503 U.S. 429, 441, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992) (declining to decide whether an act of Congress was unconstitutional under *Klein* because the act amended applicable law)). None of the courts to consider the constitutionality of the PLRA have held that it unconstitutionally prescribes rules of decision.

### 3. *The PLRA Does Not Deprive the Courts of Power to Enforce Effective Remedies For Constitutional Claims.*

The PLRA does not substantively limit the power of courts to remedy constitutional violations. It does prevent courts from providing more relief than the minimum necessary to correct *federal* violations. It reduces permissible relief to the constitutional "floor."

In *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), the Supreme Court held that a party seeking modification of a consent decree can do so by showing a significant change in fact or in law. The Court illustrated this standard by citing three situations in which lower courts correctly modified a consent decree: (1) "when changed factual conditions make compliance with the decree substantially more onerous;" (2) "when a decree proves to be unworkable because of unforeseen obstacles;" or (3) "when enforcement of

the decree without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 384.

Defendants argue that the PLRA's *limits* on remedies is a proper exercise of Congress' power to limit the jurisdiction of the lower courts. Most courts which have reviewed the PLRA have agreed. "What Congress has done through the PLRA is modify the authority of the court to award relief greater than that required by federal law.... Congress changed the law governing the district courts' remedial power." *Jensen v. County of Lake*, 958 F.Supp. 397, 403 (N.D.Ind.1997). Although the PLRA may strip the courts' remedial power down to the constitutional floor, it goes no further. "[C]ourts will continue to define the scope of prisoners' constitutional rights, review the factual record, apply the judicially determined constitutional standards to the facts as they are found in the record and determine what relief is necessary to remedy the constitutional violations." *Benjamin v. Jacobson*, 935 F.Supp. 332, 351 (S.D.N.Y.1996); *aff'd* 124 F.3d 162 (2d Cir.1997). *Contra, Hadix v. Johnson*, 947 F.Supp. 1100 (E.D.Mich.1996).

The language in *Rufo* does not define a constitutional limit on Congress' power. Rather, it is a caution to courts about modifying decrees. The PLRA does not unconstitutionally limit the remedial powers of the federal courts.

4. *The Termination Provision Does Not Violate Separation of Powers Simply Because Congress Intended to Stop Federal Courts From Micromanaging Prisons.*

 Plaintiffs quote from PLRA's legislative history to show that Congress had a political agenda; that is, to preclude the federal courts from micromanaging state prisons. However, if Congress does not otherwise violate constitutional principles, this motivation alone does not make it unconstitutional. There is no separation of powers violation on ground of Congress' intent.

B. *Due Process*

Plaintiffs contend that application of the termination provision to this consent decree would violate plaintiffs' due process rights in the judgment by (1) violating plaintiffs' vested rights in the consent decree; and (2) violating due process limitations on Congress' power to pass legislation that has a retroactive effect on contracts.

1. *Vested Rights*

 The parties implicitly agree that this argument rises or falls with the success of plaintiffs' first separation of powers argument; that is, that the termination provision improperly reopens final judgments. The vested rights doctrine is the due process analog of the separation of powers doctrine discussed in *Plaut*. For the same reasons that this court denied plaintiffs' separation of power arguments, the court finds that the PLRA does not violate plaintiffs' due process rights by interfering with their vested rights in the decree.

2. *Retroactive Effect on Contracts*

 Although the federal government is not subject to the Contract Clause, the Due Process Clause of the Fifth Amendment limits Congress' power to enact legislation that has a retroactive effect on contracts. Consent decrees are contracts for the purpose of due process analysis. "A consent decree no doubt embodies an agreement of the parties and thus in some respects is contractual in nature." *Rufo*, 502 U.S. at 378.

 Courts apply heightened scrutiny to legislation affecting contracts to which the federal government is a party. But where contracts between *other* parties are at issue, the court's "inquiry is especially limited, and the judicial scrutiny quite minimal." *National R.R. Passenger Corp. v. Atchinson, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 472, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985). Plaintiffs' argue that this court should apply heightened scrutiny, because the State of California is a party to the consent decree, citing *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). But under due process principles, the decree is clearly a contract between non-federal parties, and heightened

scrutiny only applies to *federal* contracts. *Gavin v. Branstad,* 122 F.3d 1081, 1091 (8th Cir.1997); *Benjamin v. Jacobson,* 124 F.3d 162, 175–76 (2d Cir.1997).

The PLRA and its termination provision pass the tests for rationality review. The legislation is rationally related to the legitimate government interest in guarding state sovereignty by reducing federal court involvement in state prison management. The PLRA does not violate plaintiffs' due process rights by retroactively interfering with their contract with the state.

### C. *Equal Protection*

The Due Process Clause of the Fifth Amendment "encompasses equal protection principles." *Mathews v. De Castro,* 429 U.S. 181, 182 n. 1, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976). In considering an equal protection challenge, courts generally presume the legislation at issue to be valid and uphold the statute if the classifications it draws are rationally related to a legitimate purpose. However, if a statute employs a suspect class, or burdens the exercise of a fundamental right, courts must exercise strict scrutiny, upholding the statute only if it is narrowly tailored to serve a compelling state interest. *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

Plaintiffs here do not allege that the PLRA employs a suspect class, but they charge that the termination provision burdens their fundamental right of access to the courts. "Because a prisoner ordinarily is divested of the privilege to vote, the right to file a court action might be said to be his remaining most 'fundamental political right, because preservative of all rights.'" *McCarthy v. Madigan,* 503 U.S. 140, 153, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) (quoting *Yick Wo v. Hopkins,* 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)).

Courts which have reviewed the PLRA have held that although the PLRA has certainly limited the scope of available relief, it does not constitute a burden on prisoners' rights of access to the courts. *Plyler v. Moore,* 100 F.3d 365, 373 (4th Cir.1996);

*Gavin v. Branstad,* 122 F.3d 1081, 1089 (8th Cir.1997). Both of those courts rely on *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). *Lewis* reviewed prisoners' claims that the prison was denying their right to access to the courts by denying them an adequate law library. The *Lewis* Court described the right as "a right to bring to court a grievance that the inmate wished to present," *id.* at ——, 116 S.Ct. at 2181, or "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts," *id.* at ——, 116 S.Ct. at 2180. And the Court held that an inmate must demonstrate that he had been "hindered [in] his efforts to pursue a legal claim." *Id.*

"Access to the courts" must at some point include access to judicial *remedies.* Some level of reduction of the available remedies might burden a prisoner's right of access to the courts, or at least make it hollow. The *Lewis* court's description of prisoners' rights of access, in the context of a law library, may not be an *exclusive* definition of the right of access. Nevertheless, plaintiffs cite no law holding when reducing available remedies might amount to a burden on access to the courts. Nor do they explain how to analyze when legislation on remedies "burdens" that right. Nor do they suggest why the *Lewis* court's description of this right should not apply here. This court concludes strict scrutiny does not apply to the provision at issue here, which does at least preserve a constitutional "floor."

Plaintiffs argue that the PLRA fails even rationality review. As stated above, however, the legislative purpose of preserving state sovereignty by reducing federal court control over state prisons is legitimate, and the PLRA is rationally related to that purpose. The PLRA does not violate prisoners' right to equal protection under the laws.

### D. *Interpreting the PLRA to Preserve its Constitutionality*

Plaintiffs urge this court to interpret the meaning of "federal rights" as used in the PLRA to include rights derived from federal judgments and orders, including this consent decree.

However, such a construction of the statute would make portions of the PLRA nonsensical and would contradict Congressional intent. Under § 3626(b)(2) a court ruling on a termination motion must examine whether the decree was itself necessary to remedy the violation of a "federal right," and was narrowly tailored to do so. It would make no sense under the statute to examine whether the decree was necessary when entered to remedy violations *of the decree*, or whether the decree is narrowly tailored to redress violations *of the decree*. Further, Congress made clear its intent to limit remedies in prison conditions lawsuits:

> By requiring courts to grant or approve relief constituting the least intrusive means of curing an actual violation of a federal right, the provision stops judges from imposing remedies intended to effect an overall modernization of local prison systems or provide an overall improvement in prison conditions. The provision limits remedies to those necessary to remedy the proven violation of federal rights.

H.R.Rep. No. 21, 104th Cong., 1st Sess., pt. 2 p. 34 (1995) (citations and quotations omitted).

Plaintiffs argue that their suggested construction is not nonsensical because "a district court would be required to terminate a consent decree, if the relief is no longer necessary to correct a violation of the federal rights set forth in the consent decree and subsequent enforcement orders—that is, the defendants have complied with those rights." (Opposition at 31). But such an interpretation would consign the termination provision of the PLRA to a role no greater than that of the self-termination provision already in the decree itself.

Plaintiffs make a similar argument regarding construction of the PLRA's retroactivity provision. This court has already discussed the retroactivity of the PLRA above.

### X.

For the reasons discussed, the court believes that the termination provision of the PLRA is applicable to this decree and compels the termination of its prospective relief. The court also concludes that the termination provision, including its retroactivity provision, is constitutional.

IT IS THEREFORE ORDERED that defendants' motion for termination is granted, and the decree is hereby terminated as to all prospective relief.