**James BENJAMIN, et al., Plaintiffs,**

v.

**Bernard B. KERIK, et al., Defendants.**

**No. 75 CIV. 3073(HB).**

United States District Court,
S.D. New York.

June 6, 2000.

---

Daniel L. Greenberg, John Boston, Madeline H. deLone, Lisa Freeman, Dale A. Wilker, The Legal Aid Society, New York City, for Plaintiffs.

Michael D. Hess, Corporation Counsel of the City of New York (Florence A. Hutner, Lorna B. Goodman, Daniel McCray, of Counsel), New York City, for Defendants.

### Opinion and Order

BAER, District Judge.

## I. *Introduction*

Defendants in this action, the City of New York and the Department of Corrections, et. al. (collectively the "Department") brought a motion to terminate the

Consent Decrees and all supplemental orders entered in this action and the six related cases that are encompassed herein[1] based on the recently enacted Prison Litigation Reform Act of 1995 ("PLRA" or "the Act"), Pub.L. No. 104–134, 110 Stat. 1321, §§ 801–810 (Apr. 26, 1996).

By opinion and order date July 23, 1996, this Court held that the PLRA was constitutional and vacated the Consent Decrees. *See Benjamin v. Jacobson*, 935 F.Supp. 332 (1996) (*"Benjamin I"*). A unanimous panel of the Court of Appeals for the Second Circuit affirmed in part and reversed in part. *See Benjamin v. Jacobson*, 124 F.3d 162 (1997) (*"Benjamin II"*). Rehearing en banc was granted. On rehearing, the Court of Appeals, held that the plaintiffs were entitled to the opportunity to present evidence of current and ongoing violations of federal rights and of the need for continuation of the prospective relief provided in the Decrees. *See Benjamin v. Jacobson*, 172 F.3d 144 (1999) (*"Benjamin III"*). The PLRA provides that

> Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

18 U.S.C. § 3626(b)(3).

By Memorandum and Order dated December 21, 1999, this Court decided that the "automatic termination" provisions of the PLRA can itself be "stayed" by court order. *Benjamin v. Kerik*, 1999 WL 1225264 (S.D.N.Y. Dec.21, 1999). 18 U.S.C. § 3626(e). The PLRA requires a

district court to "rule promptly" on any motion to modify or terminate prospective relief in a prison litigation lawsuit. As I observed in my December 21 Memorandum and Order,

> The Act's automatic stay provision operates to automatically suspend any prospective relief—beginning, for our purposes, thirty days after the motion's filing date, 18 U.S.C. § 3626(e)(2)(A)(i)—until the date the court enters a final order ruling on the motion. 18 U.S.C. § 3626(e)(2)(B). To be sure, Section 3626(e)(3) allows a court to postpone for a maximum of sixty days the effective date of an automatic stay for good cause. 18 U.S.C. § 3626(e)(3). On November 2, 1999, the parties to this litigation stipulated to— and this Court so ordered—an agreement which recognizes that good cause exists to extend by sixty days the automatic stay provision.

*Benjamin*, 1999 WL 1225264 at *1.

Citing the need for additional time to engage in a meaningful review of the defendants' motion, and this Court's "inherent power to stay judicial orders in order to achieve equity" I concluded that the automatic stay provision of the PLRA must be suspended until such time as this Court ruled on the defendant's motion. *Id.*, 1999 WL 1225264 at *2 (citing *Hadix v. Johnson*, 144 F.3d 925, 938 (6th Cir. 1998)). Now having had the benefit of hindsight, I am only beginning to appreciate the complexities which the defendants' motion poses for both the litigants and the Court. Indeed, the parties expended much time and effort to marshal the facts necessary to document the conditions in the Department's many prisons, prepare witnesses, and brief the issues in an expe-

1. The six related cases are: *Forts v. Malcolm*, 76 Civ. 101 (New York City Correctional Institute for Women), *Ambrose v. Malcolm*, 76 Civ. 190 (Bronx House of Detention for Men), *Maldonado v. Ciuros*, 76 Civ. 2854 (Adolescent Reception and Detention Center), *Detainees of the Brooklyn House of Detention for Men v. Malcolm*, 79 Civ. 4913, *Detainees of the Queens House of Detention for Men v. Malcolm*, 79 Civ. 4914, *Rosenthal v. Malcolm*, 74 Civ. 4854 (Adult Mental Health Center on Rikers Island). The Court will refer to all of the consent decrees and supplemental orders as the "Consent Decrees" or the "Decrees"

dited fashion. The hearing itself spanned five days; at times, testimony stretched well into the evening hours. Post-trial briefing consumed an additional five weeks. This Court has made every effort to decide this motion as expeditiously as the circumstances allow, but in the interests of thoroughness and fairness, and in light of the massive record and the complexity of the issues, it is not until today that this decision is rendered.

On February 7, 8, and 9, and again on February 14 and 15 of this year, hearings (the "February 7th Hearings") were held on the defendants' motion to terminate judicial supervision of the City's correctional facilities. The hearings were bifurcated, with the February 7th Hearings devoted to conditions affecting restrictive housing due process, attorney visitation, inmate correspondence, and law libraries in the defendants' prisons. Beginning on May 8, 2000, this Court held hearings with respect to environmental health conditions in the Department's prisons. This decision addresses the original Consent Decrees entered into between the plaintiffs and defendants in November 1978 with respect to the following provisions: (G) Correspondence; (O) Attorney Visiting; (R) Due Process and Programs for Detainees in High Security Categories; and (AA) Law Library. (*See* Stipulation for Entry of Partial Final Judgment dated November 21, 1978).

In addition to the testimony, evidence, and pleadings presented by the parties, this Court considered the written findings of OCC, the Court's independent monitor in this case. OCC was created in 1982 to act as a neutral third party to assist the defendants in achieving compliance with the Consent Decrees and related orders and to assist the parties in resolving disputes as to compliance problems. OCC was at the outset and continues to be headed by Kenneth Schoen, an expert in the field of correction and formerly the President of the Edna McConnell Clark Foundation. OCC has provided valuable services in documenting the defendants' compliance and provided the Court and the parties with regular reports assessing compliance and compliance issues. OCC has also assisted the parties in developing work plans to help bring the defendants into compliance.

President Clinton signed the PLRA into law on April 26, 1996. The Act was intended to curtail what Congress perceived to be the over involvement of federal courts in managing state prison systems pursuant to remedial orders and consent decrees. It is interesting to note that for the most part, the federal courts have served as a last resort for prison inmates, the mentally disabled, and other powerless elements in our society after conditions at institutions festered for years without remedy from the legislative or executive branches of government. Be that as it may, the Act established, inter alia, new standards for the entry and termination of "prospective relief" in civil actions concerning conditions in prisons, jails, and juvenile detention facilities. Specifically, the PLRA provides that a district court may not grant prospective relief in a prison litigation case "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). "Prospective Relief" is defined as "all relief other than compensatory money damages." 18 U.S.C. § 3626(g)(7), and in the case at bar, pertains to certain provisions of the consent decrees entered into in the late 1970's between the City of New York and plaintiff class of pretrial detainees. Section 3626(b)(2) of the Act also provides that any prospective relief that was ordered before the enactment of the PLRA will be immediately terminated "if the relief was approved or granted in the absence of a finding by the court that the relief" satisfies the tripartite requirements of § 3626(a)(1)(A), unless the court makes

new "written findings based on the record that prospective relief remains necessary" and meets the Act's requirements. 18 U.S.C. § 3626(b)(3).

As this Court has observed previously, the PLRA authorizes courts to "continue to define the scope of prisoners' constitutional rights, review the factual record, apply the judicially determined constitutional standards to the facts as they are found in the record and determine what relief is necessary to remedy the constitutional violations." *Benjamin III*, 172 F.3d at 151–52, *quoting Benjamin I*, 935 F.Supp. at 351. The February 7th Hearings were held to determine the need for prospective relief in this case.

## II. The Lewis v. Casey "Actual Injury" Requirement

The Supreme Court's decision in *Lewis v. Casey* redefined the scope of the constitutional right of access to courts. 518 U.S. 343, 349, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). The *Lewis* Court repudiated the expansive understanding of its prior decision in *Bounds v. Smith*, 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), and held that prisoners do not have a freestanding right to law libraries or legal assistance. *See Lewis* at 353, n. 4, 116 S.Ct. 2174. The Court found that to establish a violation of their fundamental right of access to courts, inmates, whether individuals or members of a class, must show actual injury. *Id.* Moreover, inmates must show "that a nonfrivolous legal claim has been frustrated or was being impeded" due to the action or inaction of prison officials. *Id.* at 353, 116 S.Ct. 2174.

The PLRA was enacted in order to facilitate the reduction of the federal judiciary's longstanding involvement in prison management. The requirement of showing actual injury to prove an access-to-court violation, the *Lewis* Court emphasized, "derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branch-

es." *Lewis* at 349, 116 S.Ct. 2174. The *Lewis* Court admitted that, of course, in some circumstances, the separate roles of the judiciary and the political branches must necessarily "briefly and partially coincide" when a court must order relief which alters an "institutional organization or procedure that causes [ ] harm." *Id.*

Plaintiffs argue that Lewis is inapplicable to this case insofar as Lewis addressed issues of proof and standing relevant to an initial determination of liability. Plaintiffs reason that the instant litigation is not a new lawsuit, and thus to prevail, plaintiffs need not "identify individual plaintiffs who are currently suffering injuries as a result of the existence of challenged conditions." (Pl. Pre–Hear. Mem. at 2.) Plaintiffs make much of the fact that final judgment was entered in this case twenty years ago, and argue that issues of standing are long settled. (*See id.*) However, the *Benjamin III* Court held that "the provisions of a consent decree that order prospective relief remain subject to modification or alteration for changes in law or circumstances. Such right as a litigant may have to prospective relief is thus neither final nor 'vested' in the constitutional sense." 172 F.3d at 164.

■ Few courts have yet considered the intersection of a motion to terminate under the PLRA with the injury-in-fact requirement of *Lewis v. Casey*. This is not surprising, as few district courts have issued decisions on the merits of a motion to terminate provisions of a consent decree pursuant to the PLRA. However, the courts which have addressed the PLRA's statutory requirements in light of the *Lewis* decision have concluded that when plaintiffs allege a violation of their right of access to courts, they must show actual injury. *See e.g., Hadix v. Johnson*, 182 F.3d 400 (6th Cir.1999); *Thompson v. Gomez*, 993 F.Supp. 749 (N.D.Cal.1997).

However, courts have not required a showing of "actual injury" in order to continue relief pursuant to the PLRA when

addressing the appropriateness of relief that involves rights other than the right of access to courts. For example, courts reviewing the continuing viability of consent decrees that concern prisoner health or safety have not required a finding of actual injury. *See Ruiz v. Johnson,* 37 F.Supp.2d 855 (S.D.Tex.1999) (finding PLRA's termination provisions unconstitutional and ruling that, even if they were constitutional, prisoners nevertheless would be entitled to relief for a variety of systemic constitutional violations involving administrative segregation, inmate safety, and excessive force); *Benjamin v. Kerik,* 1998 WL 799161 at *4–5 (S.D.N.Y., Nov.13, 1998) ("fire safety protections must be afforded at a level that does not expose the plaintiffs to an unreasonable risk of serious damage to their future health"). The district court in *Ruiz* relied in part on the Fifth's Circuit's holding that it "need not determine whether any of [the violent] incidents individually constituted an Eighth Amendment violation, for the evidence established that the totality of the circumstances in the jails were condemnable." *Alberti v. Klevenhagen,* 790 F.2d 1220, 1225 (5th Cir.1986).

In order to avoid termination of prospective relief regarding the Department's provision of law libraries and legal assistance, the plaintiffs must demonstrate an actual injury to the plaintiff class on a system-wide basis. *See Lewis v. Casey,* 518 U.S. at 351, 116 S.Ct. 2174 (1996). However, the continuation of prospective relief with respect to restrictive housing and restraint status due process does not implicate the constitutional right of access to courts, and as such, does not turn upon a finding of system-wide actual injury. Likewise, the continuation of prospective relief with respect to the Department's inmate correspondence and attorney visitation practices and procedures implicates constitutional

rights other than the right of access to courts, and as such, does not turn entirely upon a finding of system-wide actual injury. Specifically, the inmate correspondence issue implicates plaintiffs' First Amendment rights; attorney visitation procedures implicate the Sixth Amendment right to counsel.

### III. *Law Libraries*

The plaintiffs claim that Department officials have not provided an adequate law library program, in violation of their right to adequate, effective, and meaningful assistance to pursue valid legal claims in the courts. The defendants argue that the members of the plaintiff class who make between 19,000 and 22,000 visits [2] to the Department's law libraries each month (Tr. 704) are afforded "far more than the constitutional minimum of 'reasonable access to the courts.'" (Def. Post–Hear. Mem. at 3, quoting *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (quoting *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977))).

#### A. *Applicable Law*

The *Lewis* Court noted that "we have rejected [the view] … that lack of access to adequate library facilities qualifies as relevant injury in fact." *Id.* at 360, n. 7, 116 S.Ct. 2174. The Court explained that an inmate cannot demonstrate an actual injury "simply by establishing that his prison's law library or legal assistance program is sub-par in some theoretical sense." *Lewis* at 351, 116 S.Ct. 2174. Thus, this Court must determine whether the plaintiffs have demonstrated that nonfrivolous legal claims have been frustrated or impeded. *See Lewis* at 353, 116 S.Ct. 2174.

Pre-trial detainees' right of access to courts does not equate with any absolute right to law libraries. The Second Circuit

---

**2.** Department statistics indicate that for the calendar year 1999, the average daily population of the Department's jails is 16,562. (*See* Decl. of Eric Sorenson). Seventy-seven percent of the Department's inmates are released

within sixty days of admission, although fully 50% are released within five days. (*Id.*) The average length of an inmate's incarceration in Department facilities is 50 days. (*Id.*)

has held that the right of access to courts is not infringed where prisoners are not supplied with an adequate prison library, so long as they were provided with appointed counsel. In *Spates v. Manson*, the Circuit held that "the right to represent oneself in criminal proceedings, [though] protected by the Sixth Amendment, does not carry with it a right to state-financed library resources where state-financed legal assistance is available." 644 F.2d 80, 84–85 (2d Cir.1981) (citing *Hohman v. Hogan*, 458 F.Supp. 669, 673 (D.Vt.1978) ("The crux of the defendant's argument is that the *Bounds* decision requires the State to provide Either adequate libraries Or legal assistance, not both. We agree.")). Pre-trial detainees have the right to counsel, and if they decline and choose to represent themselves, the court may appoint stand-by counsel to assist. Inmates held in the Department's facilities are entitled to legal assistance in connection with their criminal cases. "The rule is that defendant[s] ha[ve] the right to legal help through appointed counsel, and when [they] decline[ ] that help, other alternative rights, like access to a law library, do not spring up." *United States v. Byrd*, 208 F.3d 592, 593 (7th Cir.2000). Thus, whether the defendants have provided adequate law library facilities is more germane to whether conditions in the law libraries have frustrated nonfrivolous civil claims of inmates challenging conditions of confinement.

■ In order for an inmate to show that the library or legal assistance program hindered his efforts to pursue a civil legal claim, he must show that he encountered more than mere delay or inconvenience. Indeed, "[a] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *See Herrera v. Scully*, 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Jones v. Smith*, 784 F.2d 149, 151–52 (2d Cir.1986)). The Supreme Court elaborated on the showing that an inmate must make to demonstrate that his efforts to pursue nonfrivolous civil claims have been "hindered":

> He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known. Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

*Lewis*, 518 U.S. at 351, 116 S.Ct. 2174. In other words, if an inmate experienced delays in pursuing a civil claim, but files acceptable legal pleadings within court deadlines, he cannot claim that he was prejudiced by shortcomings in a prison facility's law library, because he has sustained no relevant actual injury. *See Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996) ("[D]efendant also acknowledges that he was able to file the brief. Consequently, he suffered no prejudice as a result of the defendants' actions.").

## B. Testimony and Evidence

This Court heard the testimony of eight inmate witnesses with regard to the Department's operation of its law libraries and provision of legal assistance. It is important to note at the outset that six of the eight inmate witnesses were represented by legal counsel in their criminal cases.

Inmate Jeffrey Powell testified that he worked in the Department's George Motchan Detention Center ("GMDC") as an inmate law clerk, a position for which he claims the Department did not offer him any training. (Tr. 26). As an inmate law clerk, Mr. Powell prepared numerous legal documents for fellow inmates, and though he encountered difficulty completing them, he eventually completed all of them. (Tr. 56). Mr. Powell testified that he was unable to make a motion to reduce sentence because he couldn't find the appropriate section of the New York Penal Code, but he admitted that his counsel made a suc-

cessful motion to reduce sentence on his behalf. (Tr. 54). The only motion that Mr. Powell could not finish within the time allowed by the rules was a motion regarding a lab report in his drug case that was due on a Monday, but not notarized until the preceding Friday. However, it is significant that Mr. Powell did not ask his counsel to prepare such a motion, and in fact the Monday court hearing was adjourned. Thus, the testimony of Mr. Powell does not reveal that he suffered any injury-in-fact in presenting nonfrivolous legal claims to the court.

Inmate William Jones, a law library clerk at facility "C73", testified that he attempted to research and prepare a N.Y. C.P.L.R. § 30.30 [3] motion but was unable to do so because the relevant Criminal Procedure Law book was not available. (Tr. 110). Mr. Jones testified that he acted as his own attorney in his criminal case, with the assistance of a lawyer who served as an advisor. (Tr. 109). Mr. Jones claimed that his advisor filed a "grossly insufficient" C.P.L.R. § 30.30 motion on his behalf. (Tr. 111). While housed at the Department's "HDM" facility, Mr. Jones also attempted to research a motion alleging defects in his felony complaint and the supporting chemical analysis in the case against him. (Tr. 108). Mr. Jones testified that he was hindered by broken typewriters and volumes with missing pages in the HDM law library. (Tr. 108–09). Mr. Jones testified that it was as a result of those difficulties that his motion was filed two months late and dismissed as untimely. (*Id.*) It is determined that in this particular instance, Mr. Jones sustained actual injury in his attempt to defend himself in his criminal case.

Inmate Keith Todd testified that he intended to file a motion "challenging the court's discontinuation of providing voluntary disclosure forms" in his criminal case and to contest his Red I.D. status, but when referred to the books at the GRVC

law library, he encountered missing pages. (Tr. 141, 144–45). Mr. Todd admitted, however, that he did not follow up by asking the legal coordinator for further assistance once he encountered missing pages. (Tr. 145). Mr. Todd also testified that he also asked an inmate law clerk to assist in tracking down missing cases. The inmate law clerk told him that he would "see what he can do about it" but assistance never materialized. (Tr. 142). Mr. Todd noted that he was represented by counsel (in his criminal case) who "didn't want to" file a motion demanding that the court reinstate a lawfully discontinued practice. (Tr. 130). However, Mr. Todd did not have a lawyer to assist him in bringing a civil action challenging his Red I.D. status. Mr. Todd provided uncontested testimony that a Department physician provided written notice that he should not be cuffed behind his back because the practice had damaged nerves in his hands. Mr. Todd testified that defendants disregarded the doctor's order and nonetheless handcuffed him behind his back when he was transported to and from court appearances. This Court finds that Mr. Todd has sufficiently alleged the existence of a nonfrivolous claim that was never filed due to the Department's library conditions.

Inmate Garrick John was also housed in the GRVC facility and provided more testimony with respect to the law library at GRVC. Mr. John was extradited from Florida to New York pursuant to an interstate agreement which he believed required New York to take him to trial within 120 days after arriving in New York. (Tr. 320). He succeeded in filing a motion to dismiss his indictment, and then decided to file a N.Y. C.P.L.R. Article 78 petition in an effort to be returned to Florida. (Tr. 320). Mr. John also testified that certain books were missing from the GRVC law library and that, as a result, he could not locate two cases cited by his adversary in his Florida action. (Tr. 317).

---

**3.** Under New York law, a criminal defendant may bring a motion to dismiss an indictment on speedy trial grounds pursuant to C.P.L.R. § 30.30.

Thus Mr. John claims that he was unable to respond fully to his adversary's order to show cause. (*Id.*) Defendants argue that "Mr. John's experience demonstrates the sufficiency of defendants' law library services." (Def. Post–Hear. Mem. at 8, n.11). Defendants point out that Mr. John "managed to file a § 1983 case regarding censorship of his mail, and successfully to appeal denial of his claim to the Second Circuit. (Tr. 345, Def.Ex. A). From a Department jail, Mr. John also filed an action in Florida protesting his segregation from the general population in a jail there, (Tr. 344) and a writ of habeas corpus in Florida." (Def. Post–Hear. Mem. at 8, n.11).

This Court finds that plaintiffs have shown that one of Mr. John's nonfrivolous legal claims was frustrated or impeded as a result of missing materials in the Department's GRVC law library. Mr. John's inability to address certain cases cited in his adversary's order to show cause constitutes a hindrance to his writ of habeas corpus action. However, the plaintiffs failed to produce evidence demonstrating that Mr. John's putative C.P.L.R. Article 78 claims were nonfrivolous or meritorious.

Inmate Reinaldo Rodriguez sustained a broken jaw, allegedly at the hands of three other prisoners while in Department custody on October 27, 1999. (Tr. 357, 385). Mr. Rodriguez testified that he was unable to obtain a notice of personal injury claim form in the GMDC facility's law library. (Tr. 359). However, Mr. Rodriguez found the necessary claim form in the Department's Bellevue Hospital law library and filed it. (Tr. 380). Mr. Rodriguez also attempted to locate a medical malpractice claim form that would have allowed him to initiate a lawsuit against New York City's Bellevue Hospital, but could not locate this form at the GMDC law library. (*Id.*) Mr. Rodriguez alleged that the surgery performed on his broken jaw left him with a partially numb tongue and mouth and that, at times, he experiences difficulty speaking. (Tr. 360). However, Mr. Rodriguez

obtained, via mail, the necessary medical malpractice claim from the Legal Aid Society and has since managed to mail the claim form. (Tr. 385, 387). Thus, despite the inadequacies of the GMDC law library, I find that Mr. Rodriguez was not prejudiced by the shortcomings of the Department's library facilities.

Inmate Andre Greene testified that he was unable to find a copy of the Eighth Amendment in the GMDC law library, but was able to successfully file a C.P.L.R. Article 78 petition in Bronx County Supreme Court. It is determined that the compromised state at the GMDC law library did not cause an injury-in-fact to this particular member of the plaintiff class.

Inmate Richard Timmons, a *pro se* criminal defendant, testified that he was unable to find cases that had been torn from bound volumes at the Anna M. Kross Center ("AMKC"), James A. Thomas Center ("JATC"), and GRVC law libraries. He also testified that the library coordinator at JATC was unresponsive to his requests for assistance in locating missing material. (Tr. 505). Mr. Timmons also testified that the AMKC law library did not provide any F.3d volumes. The Department's Director of Law Libraries, Karen Powell, testified that the F.3d volumes from March through December of 1999 were indeed missing, due to a "mix-up" by West's Publishing, but that the Department was working with West's to rectify the situation. (Tr. 749–50). Mr. Timmons testified that at either AMKC or JATC, he couldn't be sure which, the case of *Strickland v. Washington* had been torn from the reporter, but a copy was available behind the library counter. (Tr. 503). When Mr. Timmons received the library's copy of the case, he found it to be partially illegible due to shoddy photocopying. (Tr. 505). But on cross-examination, Mr. Timmons admitted that he was able to bring his ineffective assistance of counsel concerns to a court's attention by means of a civil action. (Tr. 560). It is determined that plaintiffs presented insufficient evidence to show that

Mr. Timmons had suffered any actual injury due to the Department's law library program.

Inmate Nikolaj Amann was housed in the Department's JATC facility and assigned Red I.D. card status by prison officials. Mr. Amann claimed that in June 1997, immediately following an exchange of words with a corrections officer, he was told that a razor had been found in his property. (Tr. 530, 531). He demanded to be shown the razor, but claims that it was never produced. (Tr. 531). He claims that he signed a form stating that he was not guilty, but was never charged with anything. (Tr. 531). Red I.D. status requires that a prisoner be placed in restraints when transported outside of the Department's prisons, and consequently Mr. Amann was handcuffed behind his back for the "entire day" when transported to Court appearances at Bronx County Supreme Court. (Tr. 534). Mr. Amann testified that being handcuffed behind his back for an entire day invariably led to shoulder pain, and that on a number of occasions, he required treatment for his shoulder in the prison's clinic upon returning from a day at the Bronx courthouse. (Tr. 535–536). Mr. Amann testified that he tried in vain to have prison officials revoke his Red I.D. status, claiming that the status was undeserved but this effort proved unsuccessful. (Tr. 537). Mr. Amann, on the recommendation of a fellow prisoner, sought to have a court review his Red I.D. status. He sought relief by means of a C.P.L.R. Article 78 petition. He testified that the writ court ordered that he must first exhaust administrative remedies before seeking judicial relief, but when he tried to document the prison officials' refusal to review his status, they declined to put anything in writing. (Tr. 554). Mr. Amann testified that he was unable to find a C.P.L.R. Article 78 form in the JATC law library and that the library's legal coordinator told him that

filing an Article 78 petition would prove useless. (Tr. 538–39). He also alleged that the JATC library did not have up-to-date (1998 and 1999) legal materials to assist him in his research. (Tr. 538). Despite these obstacles, Mr. Amann was able to file his Article 78 petition and his access to the court was not denied. (Tr. 539). Thus, this Court finds that in Mr. Amann's case, no actual injury was sustained as a result of the Department's law libraries and legal assistance.

### C. Conclusions

■ To summarize, this Court finds that the plaintiffs presented only three inmate witnesses [4] who could demonstrate any actual injury arising from the defendants' provision of law libraries and legal assistance. Such a finding cannot justify continued Court supervision of the Department's prison law libraries. In *Lewis v. Casey,* the Court concluded that the district court's identification of only two instances of actual injury stemming from prison officials provision of inadequate legal assistance was "a patently inadequate basis for a conclusion of system wide violation and imposition of system wide relief." *See Lewis* 518 U.S. at 359, 116 S.Ct. 2174.

This Court does not discount the compelling inmate testimony concerning the inadequacies of the Department's law libraries. Testimony demonstrated that typewriters designated for inmate use were in deplorable, and in many cases, inoperable condition, that basic writing materials, such as pencils and paper, were usually in short supply and sometimes unavailable, that reporters, digests, and other legal volumes were routinely unavailable, missing, or mutilated. We heard how model forms that allow prisoners to draft criminal and civil pleadings were often missing, that the Department's policy of providing photocopies of missing material

4. In one of those three instances, the injury was sustained in a criminal case by a defendant proceeding pro se. As this Court noted above, there is no constitutional right to adequate libraries where legal assistance is provided.

within 24 hours has not been adhered to, and how in many instances, copies of missing material were never produced, despite repeated requests. The Department's law libraries are clearly inadequate in theory, but to prevail under current Supreme Court holdings, the plaintiffs must show actual injury. On one hand, it is disheartening that the Department's law libraries are in such a sorry state. But on the other hand, it is comforting to note that only three witnesses could show an injury-in-fact.

## IV. Restrictive housing and restraint status due process

The Department's due process procedures for the assignment of inmates to restrictive housing are set forth in Directive 6005. (Pl.Ex. 120). Directive 6005 provides that inmates placed involuntarily in administrative segregation, maximum security, protective custody or homosexual housing must be provided notice of the reason for such an assignment and, if they object, a hearing must be held within 48 hours. (*See id.*)

### A. Restraint Status

Restraint status is reserved for individuals who have committed a violent act in Departmental custody. (Tr. 857). Restraint status is pertinent only to inmate movement within a facility, while the movement of potentially dangerous inmates is addressed pursuant to "Red I.D." guidelines. (Tr. 857, 859). The restraint status policy aims to reduce violence within a prison, while the Red I.D. policy was designed to reduce stabbings and slashings outside of the jails in places like courthouses. (Tr. 858, 860). Department policy requires that inmates on restraint status be afforded a disciplinary due process hearing to address the misconduct which caused the Department to put them on restraint status in the first instance. (Tr. 858–59). Handcuffs, leg arms, and waist belts are some of the restraints that the Department may impose. (Tr. 857).

Thus, the Department requires that restraint status inmates be escorted by a corrections officer to services and programs within the facility in order to prevent other inmates from attacking restraint status inmates. The Department does not assign all restraint status inmates to maximum security housing. (Tr. 857). Department policy dictates that restraint status inmates may access the same services and programs as general population inmates. (Tr. 857).

### B. "Red I.D." status

Inmates who have been found to possess weapons while in the Department's custody are assigned "Red I.D." status, a form of restraint status. (Tr. 859). Inmates who are classified as "Red I.D." status have their hands fitted with black tubes termed "security mitts" when they are moved anywhere outside the facility. Red I.D. status bears no implication for an inmate's housing classification—Red I.D. status inmates may be housed in the general population. The plaintiffs presented evidence that Red I.D. status inmates may also be shackled for the entire day during courthouse visits. Some of these inmates have been shackled and cuffed with their hands behind their back for periods as long as fourteen hours. (Tr. 407). Plaintiffs argue that Red ID status is painful, noting that inmates often required medical attention and painkillers after spending a day shackled. (Tr. 407, 535–36).

### C. Protective custody housing, Homosexual housing, and pre-disciplinary hearing administrative segregation

The plaintiffs have not presented any evidence of unconstitutional due process practices on a system-wide basis with respect to inmates housed in protective custody or homosexual housing. OCC's most recent report noted that "all inmates housed in protective custody and homosexual housing agreed with their assignments." (Pl.Ex. 138). This is unsur-

prising, in light of the fact that most assignments to homosexual housing units are voluntary, and most assignments to protective custody are court-ordered or voluntary. *See* Tr. 840, 842–843. However, the plaintiffs presented isolated examples of prisoners assigned involuntarily to protective custody without a due process hearing. (See Tr. 889, 890 and Pl. Ex. 139, 149). Hence, this Court finds that there are no "current or ongoing" violations with respect to protective custody and homosexual housing and thus, system-wide prospective relief is not warranted. The plaintiffs also did not present any evidence that inmates assigned to administrative segregation have not been afforded due process. The Department assigns inmates who have committed certain serious infractions to administrative segregation, and disciplinary due process hearings are generally held within 72 hours. If such a hearing is not held within 72 hours, the charge is dismissed.

### D. Maximum Security Housing

Turning then to the due process afforded maximum security prisoners, an inmate may be assigned to such housing by one of two methods. The Department's office for the Chief of Security may designate an inmate as a CMC-status inmate. Alternatively, officials at a facility may determine that an inmate should be housed in maximum security.

The Department's Directive 4505R, Centrally Monitored Cases ("CMC's") addresses procedures by which inmates may contest their designation as CMC's. (Pl.Ex. 121). The CMC designation is an administrative designation designed to allow the DOC to be aware of the housing, case

status, and transport of inmates who require special monitoring—inmates, for example, with a history of escapes or assaultive behavior, with inordinate notoriety, or who are in witness protection programs. There are approximately 70 CMC maximum status inmates in the Department's custody at any given time. (Tr. 914). Directive 4505R provides that a CMC classification should not, by itself, cause an inmate to be housed in restrictive housing, nor does CMC status require a due process hearing. *Id.* However, the directive provides that a CMC prisoner involuntarily confined in maximum security or subjected to restraint status must be afforded a due process hearing.

The record reveals some confusion at the highest levels within the Department over what due process protections should have been provided to CMC-status inmates. Not until after OCC reviewed the files at North Infirmary Command were CMC-status prisoners who had been involuntarily assigned to maximum security housing, provided with due process hearings.[5] (Tr. 946–52, 976–77). The Department contended that due process requirements were satisfied for CMC-status inmates involuntarily housed in maximum security housing by providing the prisoner notice of a right to appeal the CMC classification. (Tr. 849–852). Plaintiffs argue that the standard notification form, Form # 430, could not possibly have been utilized to provide due process to CMC-status inmates.[6] Deputy Chief Skinner testified that it was not clear whether the right to appeal mentioned in Form # 430 referred to an appeal from the initial decision to impose CMC-status or an appeal from the review

---

5. Captain Lugo testified that he provided CMC-status inmates confined involuntarily to maximum security housing North Infirmary Command with an opportunity to contest their housing assignment. (Tr. 969, 974).

6. Form # 430 provides that an inmate may appeal his CMC classification by sending a letter of appeal via U.S. mail to the Department's Inspector General or the Commission-

er. The notice states that an inmate who has been designated CMC-status would have his CMC-classification reviewed within 7 days (excluding weekends and holidays) if an appeal is sent to the Inspector General, and within 15 days (excluding weekends and holidays) if an appeal is sent to the Commissioner.

that is held after 28 days. (Tr. 887). Significantly, Deputy Chief Skinner admitted that the form provides only for an appeal of CMC status, not for an appeal of housing classification. (Tr. 887). In fact, the initial notification to a prisoner that he or she has been classified as a CMC fails to indicate the type of housing assignment. (Tr. 888). Furthermore, the Inmate Rule Book provides that maximum security prisoners are to be provided face-to-face hearings. (Def.Ex. ZA). It also provides that CMC prisoners who appeal their CMC classification and are subsequently removed from CMC classification are entitled to have their records modified to reflect their new classification. (*See id.*)

The CMC Information Sheet, Form OD/OSUS states that "Due Process Safeguards And Hearing Are Required If This Placement Is Involuntary/Security Reasons." (Pl.Ex. 121 at 9 & Def. Ex. ZB at 1). Thus the Department's own form undercuts the testimony by Department officials that an appeal of CMC status was intended to satisfy due process for inmates placed in restrictive housing. In short, CMC-inmates placed in maximum security housing could reasonably conclude that they had no means of seeking a due process review of their housing status.

### E. Due Process Requirements

The Supreme Court has held that due process must be provided to prisoners charged with misconduct and assigned to administrative segregation. *See Hewitt v. Helms,* 459 U.S. 460, 476, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983):

> We think an informal, nonadversary evidentiary review sufficient both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him. An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the

prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.

*Id.*

In *Adams v. Galletta,* a recent decision addressing the due process afforded to a prisoner involuntarily assigned to maximum security housing in the Department's prisons, Judge Koeltl recognized that "[u]nder the Due Process Clause, the conditions of pretrial detention are constitutional unless they amount to punishment of the detainee." No. 96 Civ. 3750, 1999 WL 959368, *4 (S.D.N.Y. Oct.19, 1999) (citing *Bell v. Wolfish,* 441 U.S. 520, 535–37, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). "Liberty interests protected by the Fourteenth Amendment may arise from two sources— the Due Process Clause itself and the laws of the States." *Hewitt,* 459 U.S. at 466, 103 S.Ct. 864; *see also, Rudow v. City of New York,* 822 F.2d 324, 329 (2d Cir.1987); *Butler v. New York State Correctional Dep't,* No. 94 Civ. 5054, 1996 WL 438128, at *4 (S.D.N.Y. Aug. 2, 1996).

The Department's jails house inmates who in most cases have not yet been convicted or pled guilty. The Constitution affords these pretrial detainees greater rights than those afforded to convicted prisoners. Government officials may not subject pretrial detainees to punishment "prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In *Bell v. Wolfish,* the Supreme Court's watershed case involving pretrial detainees, the Court set forth a methodology for distinguishing between punitive and non-punitive actions

against pretrial confinees. Observing that "[n]ot every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense", the Court established that a particular practice or policy amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose. *Bell,* 441 U.S. at 537, 538, 99 S.Ct. 1861.

The Court of Appeals for the Second Circuit has noted that " 'the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons' is not a right protected by the due process clause itself." *Covino v. Vermont Department of Corrections,* 933 F.2d 128, 129 (2d Cir.1991) (quoting *Hewitt,* 459 U.S. at 468, 103 S.Ct. 864); *see Adams,* 1999 WL 959368 at *4 (finding that pretrial detainee's CMC designation and his subsequent housing in Department's maximum security housing was not punitive); *McFadden v. Solfaro,* Nos. 95 Civ. 1148, 95 Civ. 3790, 1998 WL 199923, at *8 (finding that assignment of pretrial detainee to segregated housing based on his security classification did not violate Due Process Clause) (S.D.N.Y. April 23, 1998); *Yant v. Scholack,* No. 95 Civ. 9462, 1998 WL 157053, at *2 (S.D.N.Y. Apr.3, 1998) (holding that the Due Process Clause does not give pretrial detainee protectable liberty interest relating to brief administrative confinement while undergoing intake and classification procedures); *Butler,* 1996 WL 438128, at *4–5 (transfer between state correctional facilities does not amount to punishment in violation of the Due Process Clause); *see also Pugliese v. Nelson,* 617 F.2d 916, 923–24 (2d Cir.1980) (holding that no due process right arises from a convicted prisoner's interest in avoiding federal CMC classification).

### F. Conclusions of Law and Findings

█ The evidence presented at the February 7th Hearings shows that assignment to restrictive housing (other than punitive segregation) does not qualify as a punishment. In fact, Department officials testified that inmates may not be assigned to maximum security for punitive purposes. (Tr. 870). The Department's policies address prison misconduct by mandating a disciplinary due process hearing within 72 hour of an inmate's infraction. (Tr. 852). The prisoner is assigned to administrative segregation while awaiting a disciplinary hearing. (Tr. 852). If a hearings officer determines that an inmate is guilty of an infraction, punishment may include assignment to a punitive segregation unit or a reprimand. (Tr. 854).

The plaintiffs have not presented evidence that the Department's administrative segregation procedures do not afford inmates constitutional due process. The defendants claim that inmates housed in maximum security housing and restraint status "are able to participate in all of the same programs and services as inmates in general population, such as law library, family and attorney visits, religious services, medical visits, and commissary visits." (Def. Post–Hear. Mem. at 27, citing Tr. 837–844, 857). The Department affords maximum security inmates access to a dayroom with a television and a table where they may congregate with other inmates assigned to their housing area. (Tr. 839). Inmates held in maximum security housing units have more corrections officers assigned to their unit, and must be escorted by a captain and a correction officer when they leave their own housing area. (Def. Post–Hear. Mem at 27). An inmate housed in maximum security housing testified that sometimes, prisoners had to wait for one or two hours for escorts. (Tr. 533). Inmate Amann testified that instead of allowing an inmate in restrictive housing to visit the commissary, the facility may choose to deliver a prisoner's requested commissary items. (Tr. 533). The defendants admit that inmates in restrictive housing may face delays in accessing

prison services, but claim that accommodations are made to mitigate delays. Deputy Chief Skinner testified that "If an inmate was delayed in going to recreation, then their [sic] recreation period would be extended. If they were delayed going to law library, the law library period would be extended." (Tr. 838–839).

The plaintiffs did not present evidence suggesting that the Department has committed any prisoner to maximum security housing units for any improper punitive purpose. Put another way, the plaintiffs have not shown "an expressed intent to punish on the part of detention facility officials." *Bell*, 441 U.S. at 538, 99 S.Ct. 1861. Furthermore, the "particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective." *Id.* at 539, 99 S.Ct. 1861. Hence, the plaintiff was deprived of no liberty interest under the Due Process Clause.

■ Even if placing inmates in the Department's restrictive housing units does not implicate the Due Process Clause, the Court must examine whether a state statute or regulation protects this class of inmates. In *Hewitt*, 459 U.S. at 471–72, 103 S.Ct. 864 the Supreme Court held, that states can create constitutionally protected liberty interests by enacting statutes or regulations that use mandatory language in establishing procedures for prison administration. Thus, under *Hewitt*, a convicted inmate was entitled to due process before he could be placed in segregation if the state had promulgated mandatory procedures to transfer an inmate from general confinement to segregation. The Court determined that "the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest." *Id.* at 472, 103 S.Ct. 864.

In *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court repudiated the *Hewitt* methodology and adopted a standard in prison litigation by convicted prisoners requiring that the liberty interest created by state statute or regulation "be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the normal incidents of prison life." *Id.* at 484, 115 S.Ct. 2293 (internal citations omitted). However, *Sandin* concerned the rights of those who had been convicted and not the rights of pretrial detainees. Although the Court of Appeals for the Second Circuit has not decided whether *Sandin* has overruled *Hewitt* for pretrial detainees, this Court agrees with the great majority of courts which have concluded that *Sandin*'s justification for limiting a convicted inmate's rights under *Hewitt* does not apply to pretrial detainees. *See Rapier v. Harris*, 172 F.3d 999, 1004–05 (7th Cir.1999); *Mitchell v. Dupnik*, 75 F.3d 517, 524 (9th Cir.1996); *Whitford v. Boglino*, 63 F.3d 527, 531 n. 4 (7th Cir.1995) (dicta); *Butler v. Westchester County*, No. 94 Civ. 8216, 2000 WL 335539 (S.D.N.Y. March 30, 2000); *McFadden*, 1998 WL 199923, at *8 n. 12; *Butler*, 1996 WL 438128, at *5 n. 1; *Brims v. Tracy*, No. 93 Civ. 3233, 1996 WL 153696, at *3 (S.D.N.Y. Apr.3, 1996); *cf. Yant*, 1998 WL 157053, at *4 n. 6. *But see Muslim v. Frame*, 891 F.Supp. 226, 234 (E.D.Pa. 1995).

As noted above in subsection E, a pretrial detainee has not been convicted and has no "expected perimeters of [a] sentence" within which discipline by prison officials logically falls. *See Sandin*, 515 U.S. at 485, 115 S.Ct. 2293. Guided by *Hewitt*, this Court must determine whether state laws or prison regulations have created a liberty interest. "The mere adoption of procedural guidelines governing day-to-day prison administration, without more, will not give rise to a state-generated liberty interest." *Butler*, 1996

WL 438128, at *5 (citing *Hewitt,* 459 U.S. at 470–72, 103 S.Ct. 864).

Plaintiffs argue that defendants' written guidelines give rise to a liberty interest because they "employ mandatory language requiring that certain procedures be utilized and that certain substantive predicates be found to exist in order to authorize restrictive confinement." (Pl. Pre–Hear. Mem. at 11). Defendants counter that the Departments' directives do not create a liberty interest in the inmates' being housed in the general population.

■ The relevant Department directive relating to restrictive housing, Directive 4100R (Classification, Appendix A) sets forth administrative and procedural guidelines used by the Department in its placement of inmates in restrictive housing pursuant to administrative and security criteria. (*See* Pl.Ex. 122). Directive 4100R does not employ "language of an unmistakably mandatory character." *See Hewitt* at 471, 103 S.Ct. 864. Rather, Directive 4100R states on its face "these criteria are not all inclusive nor are they meant to be construed as requirements for mandatory placement in restrictive housing." (*See* Pl.Ex. 122). In this case, "[t]he adoption of such procedural guidelines, without more, suggests that it is these restrictions alone, and not those federal courts might also impose under the Fourteenth Amendment, that the state chose to require." *Hewitt,* 459 U.S. at 471, 103 S.Ct. 864. *See also Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983)("[A] state creates a protected liberty interest by placing substantive limitations on official discretion. An inmate must show 'that particularized standards or criteria guide the State's decisionmakers.' ") (emphasis added) (quoting *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 467, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981)) (Brennan, J., concurring).

The relevant DOC directive relating to CMC status also affords substantial discretion in the determination of CMC cases.

Directive 4505R states that "[a]ny inmate may be designated as a C.M.C. if such inmate has been determined by the New York City Department of Correction to require central monitoring of his/her housing assignments and movements within or outside of a secure facility." (*See* Pl.Ex. ?). The Directive provides procedures for the determination of CMC cases, for notification of the inmate, and for appeal by the inmate.

Though Directives 4100R and 4505R do not create a liberty interest, plaintiffs argue that Directive 6005 creates an undeniable right to due process hearings for inmates assigned involuntarily to restrictive housing. Although they do not deny that Directive 6005 is clearly mandatory in nature, defendants nonetheless contend that 6005 should "not be regarded as the sort of mandatory promulgation to which the Supreme Court referred in *Hewitt.*" (*See* Def. Post–Hear. Mem. at 25). Defendants point out that Directive 6005 is not a regulation of the Department's own devising, but is a product of a court order, negotiated with the Court's neutral monitor and plaintiffs' counsel. Indeed, the provisions of Directive 6005 closely track the requirements of Section R of the Consent Decree. "Both require hearings within 24–48 hours wherein the inmate will have an opportunity to appear personally, be informed of the evidence against him, make statements, call witnesses, submit documentary evidence, and cross examine witnesses." (*See* Def. Post–Hear. Mem. at 25, n.39).

■ The PLRA provides that federal courts may not grant prospective relief unless the court finds that such relief is necessary to correct a violation of "federal rights." As one district court observed in deciding a similar motion to terminate prison consent decrees, "[f]or purposes of the PLRA's prospective relief provisions, 'federal rights' are limited to those rights created by federal law." *Thompson,* 993 F.Supp. at 754. Thus, "the term 'federal

right' in the PLRA's termination provisions does not include any rights conferred by consent decrees that provide relief greater than that required by federal law." *Id.* (citing *Plyler v. Moore,* 100 F.3d 365, 370 (4th Cir.1996), cert. denied, 520 U.S. 1277, 117 S.Ct. 2460, 138 L.Ed.2d 217 (1997)). Thus, to the extent that Directive 6005 requires prospective relief greater than is necessary to secure a federal right, it cannot be binding on the Department. To hold otherwise would render the PLRA's termination provisions meaningless. This Court cannot determine whether plaintiffs' federal rights are subject to an ongoing and current violation merely by reviewing whether the defendants have complied with the consent decrees, or regulations adopted pursuant to court order. Directive 6005 guarantees due process in excess of the requirements of federal law. The *Hewitt* Court did not establish a right to hearings for inmates assigned to administrative segregation. Rather, *Hewitt* stands for the proposition that notice and an opportunity to make a written statement to the person making the decision satisfies an inmate's due process rights. *Hewitt* at 476, 103 S.Ct. 864. The Court determined that the Constitution did not require prison administrators to employ trial-type procedural safeguards in order to impose restrictive confinement on an inmate feared to be a threat to institutional security. The Court reasoned as follows:

> In assessing the seriousness of a threat to institutional security prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners inter se, and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable fac-

tors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on purely subjective evaluations and on predictions of future behavior ... indeed, the administrators must predict not just one inmate's future actions, as in parole, but those of an entire institution. Owing to the central role of these types of intuitive judgments, a decision that an inmate or group of inmates represents a threat to the institution's security would not be appreciably fostered by the trial-type procedural safeguards suggested by respondent. This, and the balance of public and private interests, leads us to conclude that the Due Process Clause requires only an informal nonadversary review of evidence ... in order to confine an inmate feared to be a threat to institutional security to administrative segregation.

*Id.* (citations and footnotes omitted).

Other courts have concluded that the Constitution does not require that pretrial detainees assigned involuntarily to restrictive housing must receive a due process hearing. *See Zarnes v. Rhodes,* 64 F.3d 285, 291 & n. 5 (7th Cir.1995) (segregation of detainee without a hearing did not violate due process where it was done for legitimate security reasons, and declining to hold that every placement in administrative segregation of pretrial detainee constitutes punishment). *See also Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984) (placement of New York State prisoner in a Reclassification Unit did not deprive the prisoner of a liberty interest because the governing statute and pertinent regulation gave unlimited discretion to the State Department of Correctional Services to select and classify inmates for purposes of assignment to restrictive housing units); *Pugliese,* 617 F.2d at 925–26 (federal prisoners have no interest in maintaining non-CMC status that merits due process protection).

Plaintiffs have not established that involuntary placement in the Department's maximum security, protective custody or homosexual housing units deprives inmates of a liberty interest. However, the plaintiffs have established that the Department has not provided due process hearings to inmates placed on restraint status and Red I.D. status. The defendants argue that Directive 6005 does not require that disciplinary due process hearings be held prior to designating an inmate Red I.D. status. However, the plaintiffs have demonstrated that restraint status and Red I.D. status can prove to be a painful restraint on liberty. Inmates testified that the restraints sometimes resulted in welts and scars on their bodies. The welts and scars were exhibited to this Court. Despite the formal characterization of restraint status and Red I.D. status as a non-punitive safety measure, I find these sanctions to have a severe and deleterious effect on pretrial detainees tantamount to punishment. Indeed, Red I.D. cards are only assigned to inmates who have been found in possession of weapons while in Department custody. These extraordinary restraints on the liberty of pretrial detainees require a prompt hearing and periodic review and their use must be carefully supervised so that they become neither unnecessary nor harmful. Defendants' position is that they already follow these procedures in most respects. Defendants claim that "Red I.D. inmates receive notice and an opportunity to make a written appeal to the warden." (Def. Post–Hear. Mem. at 31). However, a Red I.D.-status inmate testified that he verbally appealed his status up through the chain of command and even spoke with the warden, and was told by each official that they would not revoke his Red I.D. status nor provide him with a written denial of his request. (Tr. 532–33, 553–54). A written denial would have allowed the inmate to exhaust his administrative appeals and commence litigation against the department in this regard.

This Court cannot conclude that the largely controverted testimony of four witnesses in this regard is insufficient to warrant prospective relief in light of the fact that only a handful of the Department's inmates are placed in restraints or classified as Red I.D. inmates. It is therefore clear that the Department should have afforded disciplinary due process hearings to such inmates in accordance with the Supreme Court's decision in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (holding that a prisoner was entitled under the Due Process Clause of the Fourteenth Amendment to notice and some kind of a hearing in connection with discipline determinations involving serious misconduct). The defendant's motion to terminate relief with regard to Consent Decree language pertaining to inmates assigned restraint status or Red I.D. status is therefore denied. The defendants are ordered to provide this Court with recommendations for prospective relief governing due process requirements for restraint status and Red I.D. status inmates within 30 days from the date of this opinion.

## V. *Attorney Visitation*

### A. *Applicable Law*

Plaintiffs charge that administrative obstacles to attorney-client visitation in Department facilities unduly burden inmates' right to counsel and right of access to courts. "Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (overruled in part on other grounds). Absolute deprivations of access to counsel are of course invalid. *See id. Procunier* teaches that substantial and unjustifiable burdens on the right of access to courts are likewise invalid. The *Procunier* Court held that "inmates must have a reasonable opportunity to seek and receive the assistance of attorneys." *Procunier,*

416 U.S. at 419, 94 S.Ct. 1800; *Dreher v. Sielaff,* 636 F.2d 1141, 1145 (7th Cir.1980) ("an inmate's opportunity to confer with counsel is a particularly important constitutional right which the courts will not permit to be unnecessarily abridged.").

The Supreme Court has explained that the right of inmates to confer with counsel must be balanced against a variety of legitimate penal interests. "Prison administrators are not required to adopt every proposal that may be thought to facilitate prisoner access to the courts. The extent to which that right is burdened by a particular regulation or practice must be weighed against the legitimate interests of penal administration and the proper regard that judges should give to the expertise and discretionary authority of correctional officials." *Procunier* at 420, 94 S.Ct. 1800.

Plainly, this Court must consider whether the challenged obstacles to inmate-attorney visitation constitute justifiable restrictions on the right of access to courts. In weighing the rights of pre-trial detainees against the interests of prison authorities, "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

The defendants' contention that there is no constitutional injury where substantial interference with attorney-client communication does not produce an "identifiable detrimental effect" citing *Procunier.* (*See* Def. Post–Hear. Mem. at 11). The *Procunier* Court upheld a district court's invalidation of a state's administrative regulation which barred any law student working with an attorney from meeting with prisoners. The Court focused on the fact that the state's arbitrary regulations unjustifiably and arbitrarily burdened the ability of lawyers to represent indigent clients. But the *Procunier* Court did not consider whether the representation of any particular prisoner or prisoners had

been compromised by the state's regulations. The Court noted that the state's regulations would "waste [the] time that might be employed more efficaciously in working on the inmates' legal problems" and noted that "[a]llowing law students and paraprofessionals to interview inmates might well reduce the cost of legal representation for prisoners." *Id.* Thus, in certain instances, time and money are legitimate concerns that must be balanced against legitimate penal interests.

### B. Findings and Conclusions of Law

 This Court finds that defense counsel routinely face unpredictable and significant delays in meeting with inmate clients at Department facilities. One can only imagine the impact of delay on the 18B lawyers that represent a significant fraction of the Department's inmates. Each out of court hour compensated at the absurd rate of $25 per hour not only fails to meet the average cost of overhead but may be a violation of Sixth Amendment rights all by itself. It is concluded on the basis of credible evidence adduced at the hearings, in the form of attorney and inmate testimony, that defense lawyers may be forced to wait between 45 minutes and two hours (or even longer) after arriving at a facility to see a client. Plaintiffs argue that such delays deter necessary consultation. Defense attorneys testified that they were sometimes forced to abandon efforts to meet with clients after arriving at a Department-run facility.

Defendants counter that attorneys may also visit their clients in courthouses throughout the five boroughs Mondays through Fridays. Plaintiffs respond that courthouse visits are not a substitute for jailhouse visits, for a host of reasons. Courthouse visits are not available during the evening, on weekends, or on less than a day's notice. Inmates may be returned to jail before the attorney arrives at the courthouse, or may not be produced at all. The attorney-client relationship may suffer when an inmate is made to wait all day at

a courthouse to see an attorney for a few minutes, and an inmate on Red I.D. status will have to endure painful restraints for an entire day to see an attorney at a courthouse.

The plaintiffs point out several factors that they believe cause delays in attorney-client visitation. First, many Departmental facilities have few counsel rooms relative to the number of prisoners housed at a particular facility. (*See* Pl. Post–Hearing Mem. at 8, Table 4). Second, inmates are not brought to counsel rooms during inmate counts. Defendants concede that little, if any, movement takes place during inmate counts. (*See* Pl.Ex. 30). Defendants point out that a lawyer's request to see a client during an inmate's meal, recreation time, work detail, or law library visit may delay the production of an inmate in the counsel room. (*See id.*) In addition, inmates must change into a jumpsuit and in some instances, submit to a search before visiting with an attorney. Furthermore, certain prisoners may not be moved to counsel rooms without escort officers. Plaintiffs contend that assigning more officers to escort duty would decrease these delays. They also suggest that inmates might be brought to visiting rooms at the moment an attorney checks into a prison, instead of after they have been processed through security and finally arrive in the visiting area.

Defendants counter that "the fact that plaintiffs have a wish list of proposed improvements does not prove that such measures are required to render plaintiffs' access to court constitutional. (Def. Post–Hear. Mem. at 15). However, when determining whether a prison regulation is reasonably related to any legitimate penological objective, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Turner v. Safley,* 482 U.S. 78, 91, 107 S.Ct. 2254, 96

L.Ed.2d 64 (1987) ("when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."). Indeed, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns." *Id.* Even Chief Vaughn admitted that the practice of stopping movements in facilities for interim inmate counts had become "burdensome." (Tr. 643). Chief Vaughn concluded that interim counts "shouldn't have the impact that they appear to have on things like attorney visits." (Tr. 643).

Defendants emphasize that plaintiffs did not put on a single witness who alleged that Departmental procedures led to a total denial of access to courts or counsel. The defendants cite *Dreher v. Sielaff* for the proposition that at least one court has decided that it would not be unreasonable for an attorney to wait an hour for an attorney-client visit to commence. 636 F.2d 1141, 1144 (7th Cir.1980). However, in *Dreher* the Seventh Circuit did not conclude that hour-long waits were always reasonable but rather observed that "the delays complained of were only about an hour long, which under some institutional circumstances may not always be unreasonable" and thus remanded to the district court for additional factual findings. *Id.* at 1144. At the hearings, plaintiffs submitted ample evidence that it is not uncommon for attorneys to wait longer than one hour to see prisoners. Defendants' argument implies that even if attorneys were forced to wait five hours to see inmates, so long as no actual injury arose on a systemwide basis, no continuing relief may be granted. This is not so. The Supreme Court has held that *Turner* applies whenever "the needs of prison administration implicate constitutional rights." *Washington v. Harper,* 494 U.S. 210, 224, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). The *Turner* Court identified four factors to guide reviewing courts in assessing whether a prison regu-

lation which impinges on constitutional rights is rationally related to legitimate penological interests: 1) the existence of a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; 2) the existence of alternative means of exercising the right that remain open to prison inmates; 3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and 4) the absence of ready alternatives as evidence of the reasonableness of the regulation. *Turner,* 482 U.S. at 89–91, 107 S.Ct. 2254. Plaintiffs have demonstrated that attorney-client visitation has been significantly compromised. This Court finds that current obstacles to attorney client visitation are not justified by legitimate penal interests.

As we have previously observed, *Lewis v. Casey* held that a prisoner's right of access to courts does not confer an "abstract, freestanding right to a law library." 518 U.S. at 351, 116 S.Ct. 2174. The *Lewis* Court observed that prison administrators may provide "alternative means" of assuring "meaningful access to the courts." *Id.* (citing *Bounds,* 430 U.S. at 830, 97 S.Ct. 1491). In New York, court-appointed attorneys serve as an alternative to functioning law libraries. Given that one avenue of plaintiffs' access to the courts is currently strewn with numerous obstacles (i.e., the Department runs some seriously deteriorated law libraries), this Court exercises utmost vigilance to ensure that the alternative avenue of access to the courts, attorney-client visitation, is not unreasonably obstructed.

This Court concludes that the Department's facilities are frequently inadequate for counsel visits and defendants' institutional security regulations are not the sole or even the primary reason for undue delays to attorney visits. Rather, defendants' policies or procedures inhibiting attorney-inmate visitation has led to unconstitutional burdens to inmate access to counsel and courts. For example, defendants have cited no legitimate reason for not providing counsel with a pamphlet detailing visiting procedures with visiting hours that can be reasonably relied upon. Defendants' security concerns do not require defense counsel to be unduly inconvenienced. Thus, the court must at this time deny defendants' motion to terminate prospective relief regarding attorney visitation. The defendants are ordered to provide this Court with recommendations for prospective relief governing attorney visitation within 30 days from the date of this opinion, bearing in mind of course that such relief must be narrowly tailored in light of the requirements of the PLRA.

## VI. *Inmate Correspondence*

Plaintiffs claim that the Department's practices with respect to inmate correspondence constitute a current and ongoing violation of federal law justifying the continuation of federal court relief. Plaintiffs allege that (1) the Department has failed to forward mail to transferred or discharged prisoners and (2) the Department has failed to provide postage for indigent prisoners to send legal mail. Defendants respond that "at best, plaintiffs have established occasional negligence, which does not rise to the level of a constitutional violation." (Def. Post–Hear. Mem. at 16).

### A. *Testimony*

OCC's recent report concludes that four of six facilities surveyed were in substantial compliance with the consent decrees inmate mail, and the remaining two appeared to be compliant with most provisions. (*See* Def. Ex. R). In accordance with Section G of the consent decrees, the Department does not read or censor ingoing or outgoing inmate mail except pursuant to a lawful search warrant. *See id.* Bureau Chief Psomas testified that incoming correspondence is opened in the presence of the inmate in order to ferret out contraband while respecting prisoners'

First Amendment rights. (Tr. 938) Psomas also testified that inmates receive incoming mail six days a week, usually within twenty-four hours of its arrival at a facility. Psomas explained that indigent inmates (inmates with a zero balance in their commissary accounts) are provided unlimited free postage for outgoing legal mail and free postage for up to two personal first-class letters per week. (Tr. 983, 988). Psomas testified that inmates may deposit outgoing mail in a locked box in their housing area or hand it directly to a mail room officer. Outgoing mail is to be collected from the drop points every day, transferred to the distribution center and mailed the same day.

Plaintiffs' presentation at the February 7th Hearings focused heavily on instances of the Department's failure to comply with certain aspects of the consent decrees and Department directives concerning the forwarding of prison mail. Bureau Chief Psomas admitted that the Department's Inmate Information System provided the capability to forward inmate correspondence for 45 days after an inmate's transfer to a prison outside the Department or release. (Tr. 992). After such time, inmate's correspondence is returned to the sender. Inmate Rodriguez testified that the Department thwarted his efforts to send a legal document by certified mail, but on cross-examination he admitted that there was no legal requirement that the correspondence be sent via certified mail. In fact, it is the Department's policy to refuse to send any letter certified mail on behalf of an indigent inmate if the law does not so require. (Tr. 989). The plaintiffs also presented testimony that the mail room at one facility contained a cache of undelivered letters that had apparently been languishing for more than six months. The plaintiffs claim that the Department did not adhere to the requirement to stamp incoming letters that were undeliverable to inmates on the date of arrival. This requirement was adopted in order to monitor the swift delivery of inmate mail.

Inmate Keith Todd testified that he was unable to file a motion "challenging the court's discontinuation of providing voluntary disclosure forms." (Tr. 140–145). He testified that after he was unable to find the necessary volumes in the law library, he attempted to send a letter to the court requesting additional time to file his motion. Mr. Todd claimed that the GRVC facility refused to send this letter to the court on the grounds that he should have purchased stamps a month or two earlier when he had funds his commissary account. However, in this instance, this Court cannot conclude that the claim hindered was a nonfrivolous claim, in light of Mr. Todd's testimony that his lawyer told him that it was no longer the policy of the district attorney's office to disclose evidence that would be used against defendants should they elect to stand trial. In fact, Mr. Todd admitted that his lawyer declined to make such a motion. (Tr. 130). Plaintiffs have not demonstrated that this motion would have been meritorious.

The defendants claim that indigent inmates are denied postage for outgoing legal mail in only a few isolated incidents. Moreover, defendants argue that "Chief Psomas's acknowledgment that such denials have 'happened on occasion', coupled with his assertion that 'it's not supposed to happen' and that steps have been taken to ensure that it does not recur, confirm that the Department's policy and general practice are to provide postage to indigent inmates, and that it does not condone denials." (Def. Post–Hear. Mem. at 17 n.22).

### B. Applicable Law

The Supreme Court has recognized repeatedly that correspondence directed to or sent by a prison inmate is protected "against unjustified interference." *Procunier v. Martinez*, 416 U.S. 396, 409, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). Courts have held that individual prisoners alleging denial of

access to courts because of mishandled mail are not entitled to relief absent a showing of prejudice. *See Jermosen v. Coughlin,* 877 F.Supp. 864, 866 (S.D.N.Y. 1995); *Armstrong v. Lane,* 771 F.Supp. 943 (C.D.Ill.1991); *Simmons v. Department of Correction of State of New York,* No. 81–CV–0644,1981 U.S. Dist. LEXIS 15951 (E.D.N.Y. May 29, 1981).

The ability of indigent inmates to send and receive legal documents implicates the constitutional right of access to courts. The Supreme Court has stated that "[i]t is indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents, with notarial services to authenticate them, and with stamps to mail them." *Bounds v. Smith,* 430 U.S. 817, 824–25, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

### C. Findings and Conclusions of Law

This Court finds that the Department's failure to preserve the right of inmate access to the courts through the mails was at worst, sporadic, and certainly not systemic. While this Court condemns even a single act that frustrates an inmates' access to the courts, I was not presented with sufficient evidence to warrant prospective relief concerning the Department's obligation to provide stamps to indigent inmates. The plaintiffs also failed to produce evidence of actual injury to even one of the nearly 17,000 inmates in the Department's custody as a result of their mail-forwarding practices. I am left to surmise that either no members of the plaintiff class were in fact harmed by the defendants' processing of inmate correspondence or perhaps class counsel was unable to identify any inmate so prejudiced. In any event, this Court cannot presume harm in evaluating whether defendants' have violated plaintiffs' right of access to courts. *See Lewis v. Casey,* 518 U.S. at 360, n. 7, 116 S.Ct. 2174 ("Courts have no power to presume and remediate harm that has not been established."); *see also Arce v. Walker,* 58 F.Supp.2d 39, 44 (W.D.N.Y.1999) ("[a] prisoner's conclusory

assertion that he suffered prejudice does not suffice to support an access to court claim . . . some showing of impaired access is required"). The plaintiffs have not shown that the Department's inmate mail practices prevented them from communicating with the courts or their attorneys or shown that inmates have missed deadlines or failed to comply with court orders. *See e.g., Arce v. Walker,* 58 F.Supp.2d 39, 45 (W.D.N.Y.1999) (listing some possible consequences of denial of access to courts).

It is determined that plaintiffs have not made an adequate showing of actual injury with regard to the Department's inmate mail practices. As with the law library issue, this Court finds no "current or ongoing" violation of inmate's right of access to courts. Moreover, under the PLRA, this Court cannot keep this provision of the consent decrees in place on the grounds that defendants might later decide to violate plaintiffs' right of access to courts. *See e.g., Thompson v. Gomez,* 993 F.Supp. 749, 758 (N.D.Cal.1997).

 For the foregoing reasons, defendants' motion to terminate prospective relief with regard to inmate correspondence is granted.

### VII. Conclusion

For the reasons set forth above, the defendants' motion to terminate provisions of the Consent Decrees with respect to conditions affecting restrictive housing due process, inmate correspondence, and law libraries in the defendants' prisons is granted. The defendants' motion to terminate provisions of the Consent Decrees with respect to restraint status due process and attorney visitation are denied. The defendants are directed to submit recommendations for prospective relief governing restraint status due process and attorney visitation within 30 days from the date of this opinion.

**SO ORDERED.**